SCEBA *v.* MANISTEE RAILWAY CO.

1. EVIDENCE—STREET RAILWAYS—NEGLIGENCE—INFANTS.

In an action for killing plaintiff's daughter, who was hit by defendant's car at a street crossing, and who was shown to be only five years and three months old at the time of the injury, it was error to exclude interrogatories of plaintiff's attorney as to what was the disposition and tractability of the child and what was the difference between the value of her help and the expenses of clothing and other necessaries; also whether her assistance would grow more valuable as she became older.[1]

2. SAME—VALUE OF SERVICES—MINOR.

Testimony that tended to throw some light upon what the pecuniary loss resulting from an infant's death might be

[1]On damages in action by parent for death of child, see note in 17 L. R. A. 77.

was admissible, and it has been held that some showing of injury or loss must appear.

3. SAME—PRESUMPTION.

The law presumes, in the case of an infant's death by wrongful act, that there has been a loss for which compensation may be given under the statute, and the loss may be estimated from the facts proved, in connection with the knowledge and experience possessed by all persons, in relation to matters of common observation.

4. SAME—DISPOSITION—DAMAGES.

And it was improper to rule out testimony of the child's teacher as to her disposition and habit of obedience, upon the alleged ground that it related to the school only.[1]

5. SAME—DAMAGES—VERDICT.

On error to review the denial of a motion for a new trial, the size of a verdict for plaintiff amounting to $71, covering the evidence relating to funeral and burial expenses only, was not so greatly insufficient as to require the court to reverse the case.

Error to Manistee; Withey, J. Submitted October 18, 1915. (Docket No. 146.) Decided December 21, 1915.

Case by Joseph Sceba, as administrator of the estate of Rosalia Sceba, deceased, against the Manistee Railway Company for the wrongful death of plaintiff's intestate. Judgment for plaintiff for an inadequate amount. Plaintiff brings error. Reversed.

*Thomas Smurthwaite*, for appellant.

*Peter T. Glassmire* (*Max E. Neal*, of counsel), for appellee.

STONE, J. This is an action on the case brought under the "Death Act" (3 Comp. Laws, §§ 10427, 10428), to recover damages by reason of an injury resulting in the death of plaintiff's decedent. At the time of the

---

[1] As to evidence of habits or character of person killed as affecting damages, see note in 1 L. R. A. (N. S.) 198.

injury complained of, the defendant owned and operated an electric street railway line in and through the city of Manistee. It was laid upon Eighth street, two blocks, from Kosciusko street on the west, to Vine street on the east. Englemann street crosses Eighth street one block east of Kosciusko street, in a well-settled neighborhood, where there were many people, including children, passing. The closed cars used by the defendant at that time were known as "pay as you enter" cars, and one man performed the duties of conductor and motorman. The plaintiff, with his wife and two children—a boy about seven years old, and Rosalia, a girl aged five years and three months—resided on the east side of Englemann street about 200 feet north of Eighth street. He owned a house and lot there. Plaintiff was a laboring man, and had steady employment only a part of the time. In September, 1914, the child Rosalia began going to school, attending the kindergarten department, located south and west of the home. The usual course traveled by the little girl in going to school was south from the home, crossing the street railway track to the south side of Eighth street, then west one block to Kosciusko street, and thence south one block to the schoolhouse. She usually returned by the same route. Her school hours consisted of the forenoon session only. On October 28, 1914, Rosalia went to school at the usual hour and remained during the session, was released at about 11 o'clock, and started for home. One witness, who saw her, said she was "tripping" along on the sidewalk on the south side of Eighth street. She arrived at the corner of Englemann and Eighth streets, and took a diagonal course from the southwest to the northeast corner. While crossing the track she was overtaken and struck by one of the defendant's east-bound cars, described as above, and was instantly killed. It was a bright, clear day, and there were no objects to prevent

a clear view of the situation. The declaration alleged numerous acts of negligence, among them being that defendant failed and neglected to operate its car slowly, and failed and neglected to have its car under proper control, and failed to keep and maintain a diligent outlook for the safety of persons upon said street crossing, and also failed and neglected to use quick stopping devices, and to ring gongs, bells, or other known signals when approaching the said crossing.

The evidence varied as to the speed of the car; the motorman swearing that he was not running to exceed 10 or 12 miles an hour, while another witness testified as follows:

"In my judgment that car which struck this child was traveling at that time at 20 miles an hour, anyway; that would be my best judgment."

We shall not state in detail the evidence relating to the claimed negligence of the defendant, for the reason that the question was submitted to the jury, and they found a verdict for the plaintiff, and the defendant has not appealed.

It is sufficient to say that an examination of the record satisfies us that the question of negligence was one for the jury; and, they having found for the plaintiff, he cannot be heard to complain of the charge upon that branch of the case, the error, if any, being harmless.

Upon the trial of the case it appeared that Rosalia was an active girl, in good physical condition; that the plaintiff was 39 years old; that his father and mother were both living; that the former was 77 and the latter 65 years of age; and that the expenses of the child's funeral and burial were $71, not including the cemetery lot.

The mother of the child, Josephine Sceba, was sworn on behalf of the plaintiff. The following is her testimony, and the rulings of the trial court relating to it:

"I am the wife of Joseph Sceba and the mother of Rosa Sceba. I am 28 years old. My father and mother are both living. They live out in the country. My father is 64 years of age and my mother is 59. They are in good health. My health is fine. At the time of her death Rosa was 5 years, 2 months, and about 18 days old. She was born on the 10th day of August, in the year of 1909. Up to the time of her death she had good health.

"*Q.* And what was her disposition as to being kindly, tractable, and obedient?

"*Counsel for Defendant:* We object to that as immaterial and incompetent, and the manner in which the question was asked.

"*The Court:* The objection is sustained.

"*Counsel for Plaintiff:* Note an exception.

"*Counsel for Plaintiff:* I didn't get the ground of the objection or the ruling?

"*The Court:* Well, it simply goes to the measure of damages, and that is what you are after.

"*Counsel for Plaintiff:* Yes.

"*The Court:* And that has no tendency to prove damages or disprove it. It is liable to be prejudiced on that subject.

"*Counsel for Plaintiff:* Well, I will want to ask her some more questions on that line, and I will say to you that in several cases it is held to be competent.

"*The Court:* I think, if you will examine that case, you will find the questions were put in a different aspect.

"*Counsel for Plaintiff:* If it is the form of my question, I would be glad to change that for you.

"*The Court:* You can prove the usefulness of this girl.

"*Counsel for Plaintiff:* That is what I want to do.

"*The Court:* Proceed and do it. It has no tendency to do it the way you put it.

"*Q.* State whether or not, Mrs. Sceba, this child was of a helpful nature?

"*A.* Yes, sir. She was willing to do anything she could do, or help me in any way she could. She was good, and willing to work, and she was always coaxing me to do something, and she would always kiss me after I should tell her to do something, and I al-

ways put her at something she could do. That is, quite a bit she could do that I would not have to do.

"*Q.* What, if any, work did you do, other than your housework, to help in supporting the family?

"*A.* Well, in summer I had a garden to take care of, and house work, and in the winter I did sewing and the housework. I had all I wanted to do. It kept me going. Before I was married, my work was farm work. Since I was married, I have had a garden on our own lot. We raised all the vegetables that were used in the house. I raised practically all the vegetables the family needed. Rosa helped me. She would water the cabbage and tomato plants. She would help me weed. She would water the chickens and feed them and gather the eggs. It helped me quite a good deal. I could be at something else, busy, and tell her what she could do. I could depend on her. She was skillful. I made the clothes for myself and children. We had quite a few fruit trees on the lot, and she picked the fruit.

"*Q.* In the manner you have stated, Mrs. Sceba, how would the benefits derived from her work and earnings, done by Rosa for you, compare with the cost of her maintenance?

"*Counsel for Defendant:* We object to that as immaterial and incompetent, as the record now stands.

"*The Court:* I am inclined to think it is incompetent.

"*Counsel for Plaintiff:* Think it is what?

"*The Court:* Incompetent. There is no proof that the lady has ever brought up any other children, or had any experience in that line.

"*Counsel for Plaintiff:* I did not hear.

"*The Court:* There is no proof this lady ever brought up and reared any other child, and no proof along that line, and no proof of experience or knowledge on her part, and you are calling for a conclusion.

"*Counsel for Plaintiff:* On her personal knowledge, she knows what it cost to maintain the child.

"*The Court:* There is no proof she had any knowledge what it cost to maintain the child, or what it would cost.

"*Q.* I will ask that question.

"*Q.* Do you know, Mrs. Sceba, about what it would cost to feed and clothe the child outside of your vegetables?

"*Counsel for Defendant:* I also object to that for the reason it is incompetent.

"*The Court:* The objection is sustained. It was all right until you spoiled it.

"*Q.* You have no knowledge of about what it would cost to feed and clothe your daughter?

"*A.* Of course, she could just now about earn her living while she was growing better and healthier, or I mean stronger, with her work that she helped me. I never kept track of what it cost to clothe her. It did not cost very much, because I made all her clothes myself and her hats and bonnets—all except her shoes. Her shoes were about all we had to buy for her.

"*Q.* I will ask you now, how the cost of materials, that you purchased for her food and clothing, would compare with what benefits you derived from her little efforts to help you out?

"*Counsel for Defendant:* We object to that as incompetent the way the record stands.

"*The Court:* I will sustain the objection, for the reason she has already answered the question, and I am doubtful whether it is competent or not. She has already said it was about even.

"*Counsel for Defendant:* I move to have that answer stricken out, if she answered it.

"*Counsel for Plaintiff:* I think it is fairly competent.

"*The Court:* I will let it stand for the time being, but it is pretty close to the line.

"*Q.* Now, Mrs. Sceba, with your knowledge of the disposition of Rosa, you can state whether or not her efforts in that behalf, and the benefits that were derived from her services, would increase or diminish?

"*Counsel for Defendant:* I object to that as incompetent.

"*The Court:* The objection is sustained. I think it is a question for the jury.

"*Counsel for Plaintiff:* Give me an exception.

"*A.* Rosa was of medium size for her age. I did not work out for other people at any other work except sewing.

"*Q.* State whether or not you have had opportunity to work out to any greater extent as this child grew older?

"*Counsel for Defendant:* We object to that as incompetent and immaterial.

*"The Court:* I think so. It calls for a conclusion based upon the future, of which she could have no knowledge, from the evidence already in, and which may hereafter be put in the case. In other words, I think to admit that line of proof would be an invasion of the province of the jury.

*"Counsel for Plaintiff:* There are two classes of cases in Michigan on that subject. * * * (Here followed a discussion of the Michigan cases herein referred to.)

*"The Court:* I am trying to rule right along the other case you are talking about.

*"Counsel for Plaintiff:* If your honor is aware of the case, I have nothing further to say.

*"The Court:* I don't think there is anything in that case that would admit the proof I have ruled out.

*"Counsel for Plaintiff:* Under the prior case it was.

*"The Court:* I do not know any case it was.

*"Counsel for Plaintiff:* I think they have got that pretty well down to solid rock, when they state the jury was as good a judge as the parents or anybody else. That is all of this witness. You may cross-examine."

Cross-Examination: "Our little girl first began going to school the beginning of September, 1914. She was in the kindergarten. Miss Lorenz was her teacher.

*"The Court:* I think, in order to make this record safe, I will strike from the record the testimony of this witness of what the child earned and expenses of maintenance, as about equal. That is the substance or gist of what she said. I will strike it out. It calls for a conclusion, and it calls for simply the sentiment of this mother, as to the value of the services of this little girl. There is nothing to base it upon. She has given her testimony, and she has nothing upon which she can make that assertion. It is for the jury to say, and not for her to say. It can be stricken out.

*"Counsel for Plaintiff:* Note an exception."

The case was submitted to the jury, and the trial resulted in a verdict for the plaintiff in the sum of $71.

In the course of its charge to the jury the court instructed them that if they found for the plaintiff, and found that the services of the child during her minority would have exceeded the cost of her maintenance,

then the father was entitled to recover that amount, whatever they found it to be; that in passing upon that question they should take into consideration the probabilities of the life of the child and the probabilities of the lives of the parents; and the attention of the jury was called to the length of the lives of the grandparents, and of the father and mother of the child, and of the state of health of the grandparents and of the father and mother, and of the state of health of the child at the time of her death. The court said:

"All these things you are to take into consideration in passing upon this subject. If you find for the plaintiff, if he is entitled to recover anything, he shall recover the cost of the burial, of the child, the amount of which has been testified in the evidence and is uncontradicted—$71. * * *

"The law says that you are to give fair and just compensation to these parents and this father, the plaintiff in the case, if you find for the plaintiff, in regard to his pecuniary loss, and nothing else at all.

"Counsel has made some figures in your presence. They are not controlling upon you, and they were permitted, simply as a part of his argument, and the deductions he makes, or seeks to make, from the proofs in the case. It is your province to say finally what has been proven in the case, and what the damages are, if there are any over and above the $71.

"So I say to you finally and briefly that if you find the defendant's negligence has been established, on any of these declared heads, in the manner I have suggested, your verdict will be for the plaintiff. * * *

"If you find for the plaintiff, he is entitled to receive at least $71, the cost of the burial of the little girl. If you find he has suffered a pecuniary loss because of her premature and early death, then he is entitled, in addition to the $71, to whatever you may fairly and justly find on that head, taking into consideration all the evidence in the case."

There was a motion for a new trial, based upon the grounds, among others, that the verdict was wholly inconsistent, unjust, and contrary to law, and that the damages awarded were wholly inadequate.

In his reasons for the denial of the motion for a new trial, the circuit judge, among other things, said:

"It is true that a verdict like this shocks the sense of mankind, but that is because we have a sympathy which the law absolutely prohibits the jury from indulging in, or the court either. In my opinion, the law should permit damages for grief and sorrow, and then there would be damages of a substantial and tangible kind. My understanding is, the lawmakers refuse to indulge that, because it has been said by some writers that that would put a premium on the death of the child and jeopardize its life in very many cases; and that is probably true, nevertheless, so long as the law is as it is, and makes it purely and solely a question of pecuniary loss or profits, I think the verdict is right. I think that is the view the jury took of it. I made that plain to them, or tried to—that they could not indulge in either sympathy or prejudice, and that it was simply a matter of dollars and cents. There were men on that jury who know, I am sure, that to rear a girl from the cradle to her legal majority is an expensive proposition. Of course, it is not as expensive among the laboring classes, but there were members of that class on the jury, and they know. And the peculiar thing about it is that the latest decisions on that subject leave the whole question of damages or lack of it to the judgment of the jury, regardless of the proof. To my mind, that is a perversion of every principle of the law, but if it is the law, and is to obtain as the law, then this court has no right to enter the jury box and say that they are mistaken in their judgment, because it is their judgment and nothing else, and it is based upon nothing. There wasn't a word of proof in the case as to what it cost to maintain this child, or any other child, or what it could earn, or what any other child could earn. There was some proof—a little— as to what the child did. And I say, if that is the law, then I have no right to meddle with this verdict at all, on this ground."

A judgment was entered in accordance with the verdict, and the plaintiff has brought the case here upon a writ of error, and there are 29 assignments of error. Many of these relate to the question of negligence, and,

for the reason already stated, will not be considered by us. The assignments of error relating to the question of damages were:

(2) That the court erred in sustaining the objection of counsel for defendant to the following question put to Josephine Sceba on direct examination: "What was her disposition as to being kindly, tractable, and obedient?"

(3) Also, in sustaining the objection of counsel for defendant to the following question asked Josephine Sceba: "Q. I will ask you now how the cost of the materials, that you purchased for the food and clothing, would compare with the benefits you derived from her little efforts to help you?"

(4) Also, in sustaining the objection to the following question: "Q. Now, Mrs. Sceba, with your knowledge of the disposition of Rosa, you can state whether or not her efforts in that behalf, and the benefits that were derived from her services, would increase or diminish?"

(5) Also, in sustaining a like objection to the following question: "Q. State whether or not you would have had opportunity to work out, to any greater extent, as this child grew older?"

(6) That the court erred in ruling upon its own motion in striking certain of the testimony of Josephine Sceba from the record, as above set forth.

(7) That the court erred in sustaining the objection of counsel for defendant to the following question asked Nina Lorenz: "Q. What was her disposition, Miss Lorenz, as to being an obedient child?"

The twenty-third assignment of error is to the effect that the court in its charge to the jury erred, in that the cost of the burial was emphasized, and practically and in effect made the sole basis of damages, if the jury should find for the plaintiff. The twenty-fifth, twenty-sixth, and twenty-seventh assignments of error are based upon the portion of the charge above set forth. The twenty-eighth assignment of error is to the effect that the court erred, in that it did not instruct the jury as to the proper and lawful manner of comput-

ing the damages, or as to the elements of damages to the plaintiff, if the jury should find the defendant negligent as charged, which caused the death of Rosalia Sceba. The twenty-ninth assignment of error is to the effect that the court erred in denying the motion of plaintiff to set aside the verdict of the jury and the judgment entered thereon, and to grant a new trial for the reasons set forth in said motion. The second, third, fourth, fifth, and sixth assignments of error will be considered together. We note the fact that the ruling upon which error is assigned in the third and fifth assignments of error, do not appear to have been excepted to, but the ruling of the court in striking from the record certain testimony covered by the sixth assignment of error was duly excepted to.

A careful perusal of this record has satisfied us that there was prejudicial error in the rulings of the court relating to the testimony of Josephine Sceba. In the earlier cases of *Cooper* v. *Railway Co.*, 66 Mich. 261 (33 N. W. 306) ; *Rajnowski* v. *Railroad Co.*, 74 Mich. 20 (41 N. W. 849) ; *Hurst* v. *Railway*, 84 Mich. 539 (48 N. W. 44) ; *Charlebois* v. *Railroad Co.*, 91 Mich. 59 (51 N. W. 812) ; and *Snyder* v. *Railway Co.*, 131 Mich. 418 (91 N. W. 643)—it was the practice to offer testimony generally, consisting of the judgment or opinion of witnesses as to the probable earnings, on the one hand, and cost or expense of rearing a child until majority, upon the other; and it was held that testimony, throwing any light upon what the pecuniary injury resulting from death would be, was admissible. And in the *Hurst Case* this court said:

"Some pecuniary injury or loss must be shown by the evidence."

In the *Charlebois Case* it was said that the plaintiff must show that some person had suffered some pecuniary injury by the death, and that the statute did not imply that damages and pecuniary loss necessarily fol-

lowed from the negligent killing.   In the *Rajnowski Case,* it was held that:

"The testimony of witnesses who are shown by their knowledge or experience to be qualified to express an opinion upon the pecuniary value of such a life is admissible, not for the purpose of controlling, but of aiding, the jury in arriving at a just conclusion."

In the *Cooper Case* a judgment of $1,550 upon the death of a girl 11 years of age was sustained; and it was held that the jury could not give damages founded upon their fancy, or based upon visionary estimates of probabilities or chances.   In the *Snyder Case* the action of the lower court in refusing to set aside, as inadequate, a verdict of $250 for negligently causing the death of a boy between 11 and 12 years old, was sustained.

In the case of *Black* v. *Railroad Co.,* 146 Mich. 568 (109 N. W. 1052), this court did not hold that such evidence, as above referred to, was not admissible, but did hold that where evidence had been given as to the age, calling, and condition of health of the father, and of the age and condition of the mother, together with evidence that the child was healthy, intelligent, of a good disposition, and obedient to its parents, that was sufficient to authorize an award of substantial damages, and the court, in that case, refused to set aside a verdict of $1,500 damages.   Justice MOORE, who wrote the opinion of the court, after quoting the reasons of the circuit judge in his denial of a motion for a new trial, and after calling attention to the cases of *Parsons* v. *Railway Co.,* 94 Mo. 286 (6 S. W. 464), and *City of Chicago* v. *Hesing,* 83 Ill. 204 (25 Am. Rep. 378), and other authorities, concluded his opinion in these words:

"The jurors have all been boys.   The average juror knows the conditions which surround a boy in a family like that of plaintiff.   We think it cannot be said, as

a matter of law, that there was no basis upon which to find a verdict for pecuniary loss."

This case has since been cited with approval.

Applying either rule of evidence, as indicated by the above-named cases, we think the ruling of the trial court was prejudicially erroneous in refusing to permit Josephine Sceba to answer the question, "What was her disposition as to being kindly, tractable, and obedient?" and the question covered by the fourth assignment of error, and in striking out the testimony referred to by the court, covered by the sixth assignment of error. It is no answer to say that the mother did not testify in dollars and cents as to the value of the child's earnings, or the expense of maintenance. She had testified generally, as to the nature and extent of those services, and the expense she had been put to in clothing the child. Her opinion or judgment, whether the child's efforts, and the benefits derived from her services, would in the future increase or diminish, was admissible. We think she was competent to testify upon that subject. Such testimony would not be mere speculation, conclusion, or sentiment, but would have had a tendency to prove pecuniary damage. By the rulings above referred to, the jury were deprived of testimony which would probably have aided them in reaching a substantial verdict in the case.

In denying the motion for a new trial, the trial judge said:

"There wasn't a word of proof in the case as to what it would cost to maintain this child, or any other child, or what it could earn, or what any other child could earn. There was some proof—a little—as to what the child did."

In our opinion, the principal reason why there was no evidence upon those subjects was because of the ad-

verse rulings of the court in dealing with the testimony of Josephine Sceba. The infirmity in the charge of the court was that having erroneously narrowed the subject of the inquiry of the jury, by the rulings above referred to, the doctrine of the *Black Case* was not referred to, but was wholly ignored; so that the jury had no basis for the assessment of damages beyond the funeral expenses. We note the fact, however, that the plaintiff did not present any requests to charge, upon this subject, and we should hesitate to reverse the case upon the charge alone.

It has been held by many courts, including those cited in the *Black Case*, that the law presumes, in the case of the death of a minor child by wrongful act, that there has been a loss for which compensation may be given under the statute, and that the loss may be estimated from the facts proven, in connection with the knowledge and experience possessed by all persons, in relation to matters of common observation. 8 R. C. L. p. 835, citing many cases. While the verdict appears to have shocked the sense of the trial judge, had there been no errors in the rulings and charge, as indicated, we should not feel like holding that the damages awarded were wholly inadequate as matter of law. But we are satisfied that the amount of the verdict was the result of the errors above pointed out, and that the jury were too much circumscribed in their inquiry by the rulings and charge.

The witness Nina Lorenz, the teacher of the child, was asked a question, above referred to, which, being objected to as incompetent and immaterial, the court excluded, using the language, "Sustained so far as school is concerned," to which ruling plaintiff's counsel excepted. We hardly understand the purport of this ruling. We think it was competent for this witness, or any other person acquainted with the child, to testify to her disposition and habits of obedience. The

record shows, however, that this witness later gave testimony as to the general disposition of the child, and we only refer to this ruling because it wás consistent with other rulings which narrowed the scope of the jury's inquiry, and led to the verdict and judgment in the case.

For the errors pointed out, the judgment of the court below is reversed, and a new trial granted.

BROOKE, C. J., and PERSON, KUHN, OSTRANDER, BIRD, MOORE, and STEERE, JJ., concurred.