CURRIE *v.* FITING.

DECISION OF THE COURT.

1. DEATH—DAMAGES—LOSS OF COMPANIONSHIP OF ADULT DAUGHTER.
   Damages for loss of society and companionship of adult
   daughter were properly awarded in action under death act, the
   pecuniary value of a human life being a compound of many
   elements (CL 1948, §§ 691.581–691.583).

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 5]  16 Am Jur, Death § 199.
   "Sentimental" losses, including mental anguish, loss of society,
   and loss of marital, filial, or parental care and guidance, as
   elements of damages in action for wrongful death.  74 ALR 11.
[2]  16 Am Jur, Death § 57.
[3]  16 Am Jur, Death §§ 176, 177, 182, 190–200.
[4]  39 Am Jur, Parent and Child §§ 68, 70.
[6]  16 Am Jur, Death § 258.
[7]  16 Am Jur, Death §§ 202, 203.
[8, 14]  16 Am Jur, Death § 384.
   Recovery of pre-judgment interest on wrongful death damages.
   96 ALR2d 1104.
[9]  16 Am Jur, Death §§ 190–200.
[10]  16 Am Jur, Death § 185.
   Exemplary or punitive damages as recoverable in action for death.
   94 ALR 384.
[11]  16 Am Jur, Death § 385.
   14 Am Jur, Costs § 11.
[12]  16 Am Jur, Death § 182.
[13]  50 Am Jur, Statutes § 321.
[15]  16 Am Jur 2d, Constitutional Law §§ 210–213.
[16]  16 Am Jur 2d, Constitutional Law § 221.
[17]  50 Am Jur, Statutes § 236.
[18, 20]  16 Am Jur, Death §§ 196, 199.
[19, 31]  16 Am Jur, Death §§ 89, 247, 251.
[21]  50 Am Jur, Statutes § 228.
[22]  50 Am Jur, Statutes §§ 44, 45.
[23]  50 Am Jur, Statutes § 350.
[24]  20 Am Jur, Evidence §§ 120, 122.
[25]  50 Am Jur, Statutes §§ 217, 221, 318, 323.
[26, 27]  14 Am Jur, Courts § 79.
[28]  14 Am Jur, Courts §§ 59, 64.
[29, 30]  16 Am Jur, Death § 304.
[32]  16 Am Jur, Death §§ 89, 182.
[33]  16 Am Jur, Death §§ 247, 251, 252.

SEPARATE OPINION.

T. M. KAVANAGH, C. J., and SOURIS, SMITH, and ADAMS, JJ.

2. DEATH—CONSTRUCTION OF STATUTES.

*The wrongful death act is remedial in character and is to be construed liberally in favor of the beneficiaries (CL 1948, § 691-.582).*

3. SAME—ELEMENTS OF PECUNIARY VALUE OF A HUMAN LIFE.

*The pecuniary value of a human life is a compound of many elements, such as expenses of birth, food, clothing, medicines, instruction, nurture, and shelter, of value to others of the deceased as part of a functioning social and economic unit, of companionship, when construing the measure of damages allowable under the death act (CL 1948, § 691.582).*

4. PARENT AND CHILD—MAJORITY.

*The obligations of a son or daughter to his or her parents do not terminate at age 21 in the eyes of the law (PA 1925, No 146, as amended).*

5. DEATH—DAMAGES—ADULT CHILD—LOSS OF SOCIETY AND COMPANIONSHIP.

*Damages for loss of society and companionship were properly awarded parents of deceased who was nearly 21 years and 11 months of age at time she was killed (CL 1948, §§ 691.581–691.583).*

6. SAME—RECOVERY PERMITTED—PROBATE CODE—QUESTIONS REVIEWABLE.

*Recovery in action brought under the wrongful death act is not governed by the probate code, especially where the issue is not before the Supreme Court for determination (CL 1948, §§ 691.582, 702.115).*

7. SAME—PROSPECTIVE DAMAGES—PRESENT WORTH.

*Prospective damages, awarded under the death act, must be reduced by computation of present worth (CL 1948, §§ 691.581–691.583).*

---

REFERENCES FOR POINTS IN HEADNOTES

[34]  50 Am Jur, Statutes § 228.
[35]  52 Am Jur, Trespass on the Case §§ 3, 4.
[36]  30A Am Jur, Judges §§ 27, 37.
[37]  14 Am Jur, Costs § 91.
   16 Am Jur, Death § 385.
[38]  16 Am Jur, Death §§ 202, 203, 384.
[39]  16 Am Jur, Death § 384.
[40, 41]  16 Am Jur, Death §§ 202, 203.
[42]  16 Am Jur, Death §§ 182, 199.

8. SAME—DAMAGES—INTEREST.

*Interest should be imposed by the trier of the facts upon the amount awarded under the death act from the date of death to the date of the verdict (CL 1948, § 691.582).*

9. SAME—DAMAGES.

*Damages under the death act are not limited to the funeral expenses which had been incurred together with the loss of the future society and companionship of the deceased, since human life is a compound of many elements, such as dependency, expenses of birth, food, clothing, medicines, instruction, nurture, and shelter, of value to others of the deceased as part of a functioning social and economic unit, of companionship, and other elements (CL 1948, § 691.582).*

10. SAME—PUNITIVE DAMAGES.

*No exemplary or punitive damages may be awarded under the death act, since there is no express provision therefor in the statute (CL 1948, § 691.582).*

11. COSTS—BOTH PARTIES PREVAILING IN PART.

*No costs are awarded on appeal, where both parties have prevailed in part.*

SEPARATE OPINION.

O'HARA, J.

12. DEATH—DAMAGES—PECUNIARY VALUE OF HUMAN LIFE—COMPANIONSHIP.

*The pecuniary value of a human life is a compound of many elements, including mutual society and protection, companionship, and such is now properly considered an element of damage recoverable in an action under the wrongful death act (CL 1948, §§ 691.581–691.583).*

13. COURTS—CONSTRUCTION OF STATUTES—NOTICE TO LEGISLATURE.

*The presumption of legislative notice of interpretation of statutes by the Supreme Court applies to changes of interpretations which may have been of many years' standing.*

14. DEATH—DAMAGES—INTEREST—JUDGMENT.

*Interest should not be allowed on judgment in an automobile negligence case from date of death by being added to the judgment.*

DISSENTING OPINION.

BLACK, J.

15. CONSTITUTIONAL LAW—SEPARATION OF POWERS.

   *No department of government shall exercise or usurp the powers belonging properly to another (Const 1963, art 3, § 2).*

16. SAME—SEPARATION OF POWERS.

   *Pursuant to the separation of powers provision of the Constitution the judiciary is responsible for the protection of the executive and legislative departments from judicial appropriation of their respective powers to no less degree than fending off their attempts to invade or control the judicial department (Const 1963, art 3, § 2).*

17. STATUTES—CONSTRUCTION.

   *A statute must be construed in the light of circumstances existing at the time of its enactment, not in the light of subsequent developments.*

18. DEATH—DAMAGES—ADULT DAUGHTER—LOSS OF COMPANIONSHIP.

   *Damages for loss of companionship of adult unmarried daughter may not be recovered under the death act by nondependent parents who have made no claim of contributions from her (CL 1948, §§ 691.581–691.583).*

19. SAME—DAMAGES—DEPENDENTS.

   *Damages for pecuniary injury, if and when recovered under the death act, should be distributed only to those persons who were dependents of the decedent (CL 1948, §§ 691.582, 702.115).*

20. SAME—DAMAGES—DEPENDENTS—LOSS OF COMPANIONSHIP.

   *Loss of companionship suffered by nondependents of a decedent is not a pecuniary injury for which damages may be recovered under the wrongful death act (CL 1948, § 691.582).*

21. STATUTES—AMENDMENT BY JUDICIARY.

   *The fact that a statute is cruel in specific applications provides no ground for judicial amendment of the statute.*

22. SAME—CONSTITUTIONAL LAW.

   *The legislature may be as barbarous as it wishes in the enactment and re-enactment of statutes so long as it infringes no constitutional provision.*

23. SAME—CONSTRUCTION—IN PARI MATERIA—INTENT.

   *Portions of 2 different acts that were enacted to a common purpose by the same legislative assembly are properly looked upon as unitary, and are to be considered as in pari materia in determining legislative intent.*

24. EVIDENCE — JUDICIAL NOTICE — EDUCATION OF CHILDREN — PE-
CUNIARY SERVICE.

*The Supreme Court takes judicial notice of the fact that Michi-
gan's agricultural society has shifted to an industrial and
technical economy requiring more and more graduate as well
as undergraduate learning, and that parents as a rule no
longer command the pecuniary or pecuniarily measurable serv-
ice of their children during minority, obliging parents to
spend more on the child during and usually beyond minority.*

25. STATUTES—CONSTRUCTION.

*Statutes when called into application are construed in accord-
ance with construction of terms used therein as had theretofore
been adopted by courts from other States and as thereafter
construed by contemporary jurists.*

26. COURTS—CONSTRUCTION OF OPINIONS.

*The opinion and decision of a court must be read and examined
as a whole in the light of the facts upon which it is based.*

27. SAME—CONSTRUCTION OF OPINIONS.

*General expressions in opinions of a court are to be taken in
connection with the case in which those expressions are used.*

28. SAME—PRECEDENTS—PARENT AND CHILD—ADULT CHILDREN.

*A decision in a case wherein the Supreme Court was divided as
to whether verdict for death of a minor under the death act
was or was not excessive does not constitute a precedent for
case where the deceased was an adult daughter of the plaintiff
administrator and latter and his wife had not been pecuniarily
dependent upon her, there being a difference in legal relation-
ship between parent and minor child on one hand and parent
and adult child on the other (CL 1948, § 691.582).*

29. DEATH—DAMAGES—PRESUMPTIONS—PARENT AND CHILD—ADULT
CHILD.

*The presumption that the wrongful death of a minor child re-
sults in a pecuniary loss to the parents does not obtain when
there is the wrongful death of an adult child (CL 1948, §§
691.581–691.583).*

30. SAME—DAMAGES—EVIDENCE—PRESUMPTIONS.

*Pecuniary injury to the surviving parents of a deceased adult
daughter must be proved in an action under the death act,
since presumption of pecuniary loss does not obtain (CL 1948,
§§ 691.581–691.583).*

**31.** Same—Dependents—Statutes.

> The statutory emphasis on dependency in the provision of the probate code relative to the distribution of proceeds of an action brought under the amended death act limited the recovery to such surviving spouse and next of kin as were dependent in fact upon the deceased (CL 1948, §§ 691.582, 702.115).

**32.** Same—Pecuniary Injury—Dependents.

> Pecuniary injury, as the term is used in the wrongful death act, is limited to monetary injury suffered by eligible survivors of the one wrongfully taken, in view of the provisions of the unitarily-enacted amendment of the death act and the probate code limiting distribution of death action recoveries to dependents (CL 1948, §§ 691.582, 702.115).

**33.** Same—Damages—Dependents—Statutes.

> The amendment of the wrongful death act whereby recovery thereunder was limited to those who would inherit personalty of the deceased had he died intestate and limiting distribution to surviving spouse and next of kin who suffered pecuniary injury and unitarily-enacted probate code provisions that further limited distribution to dependents of the deceased control recovery and distribution, either by probate-approved settlement or circuit court judgment, of the pecuniary loss, the statutes being looked upon and applied as one (CL 1948, §§ 691.582, 702.115).

**34.** Constitutional Law—Separation of Powers—Judges.

> Judges may not properly usurp legislative powers, especially where there is an important public interest not represented before the court.

**35.** Common Law—Remedy—Action on the Case.

> Justice may impel the creation of the common-law remedy of the special action on the case to accommodate a common-law right, where there is no other remedy.

**36.** Judges—Statutes.

> Judges who have the power, though not the right, to ignore the mandate of a statute, and render a judgment in despite of it, do, by abuse of the power, violate the law.

**37.** Costs—Public Question—Loss of Companionship of Adult Daughter.

> No costs are allowed on appeal in action under the death act to recover damages for loss of companionship of adult daughter upon whom the parents were not financially dependent, where

issue is of general public concern (CL 1948, §§ 691.581–691-.583, 702.115).

38. DEATH—DAMAGES—PRESENT VALUE.

*Interest is rightfully allowed by the jury in an action under the wrongful death act upon due instruction that damages for pecuniary injury must be assessed and reported by a lump-sum verdict constituting the present value as of the time of verdict of the damages found as having been suffered and to be suffered by such beneficiaries as there may be under the act (CL 1948, §§ 691.582, 702.115).*

39. SAME—DAMAGES—INTEREST TO TIME OF VERDICT.

*The personal representative who is found entitled to damages for pecuniary injury suffered by the beneficiaries in an action under the death act is entitled to have added, by the jury, legal interest calculated upon the amount of damages suffered by the beneficiaries between the death and the verdict (CL 1948, §§ 691.581–691.583).*

40. SAME—FUTURE DAMAGES—INSTRUCTION.

*The lump-sum amount the jury must ascertain in assessing damages under the death act is subject to instructed reduction of the included amount representing future damages pursuant to the customarily instructed formula for division (CL 1948, §§ 691.581–691.583).*

41. SAME—DAMAGES—JURY—JUDGES.

*The same rules of damages and assessment thereof under the death act should be made to apply whether the issue is tried to the court or to a jury (CL 1948, §§ 691.581–691.583).*

DISSENTING OPINION.

DETHMERS and KELLY, JJ.

42. DEATH—DAMAGES—LOSS OF SOCIETY AND COMPANIONSHIP OF ADULT DAUGHTER—EVIDENCE.

*Damages for loss of society and companionship of 21-year and 11-month old daughter may not be awarded under death act, in the absence of evidence showing pecuniary loss or a reasonable expectancy of same (CL 1948, §§ 691.581–691.583).*

Appeal from Saginaw; O'Neill (James E.), J. Submitted May 8, 1964. (Calendar No. 76, Docket No. 50,112.)  Decided May 10, 1965.  Rehearing denied June 7, 1965.

Case by Gilbert A. Currie, Jr., administrator of the estate of Linda Kay Hopkins, deceased, against Fred E. Fiting for damages arising from death in automobile collision July 20, 1960. Judgment for plaintiff. Defendant appeals. Plaintiff cross-appeals. Affirmed in part, reversed in part, and remanded.

*Peter F. Cicinelli* and *Eugene D. Mossner,* for plaintiff.

*Smith, Brooker & Harvey* (*Webster Cook,* of counsel), for defendant.

ADAMS, J. This case involves a wrongful death action brought for the death of Linda Kay Hopkins, a 21-year-old girl, who was killed in a two-car collision. The trial judge awarded $3,147.14 for funeral and burial expenses, $1,000 per year for loss of society and companionship of decedent for the average life expectancy of the surviving parents, and $3,131-.18 interest from the date of the accident, for a total of $32,778.32.

## I.

The first question is the right of the administrator to recover more than funeral expenses, there being no evidence of financial dependency by the parents of Linda, her sole heirs. CL 1948, § 691.582 (Stat Ann 1959 Cum Supp § 27.712).[1]

It is the contention of appellant that the test for recovery of damages for the death of a person over 21 years of age is either financial dependency (*MacDonald* v. *Quimby,* 350 Mich 21) or assumption by deceased of an obligation to support a surviving next-

[1] See, currently, CLS 1961, § 600.2922 (Stat Ann 1962 Rev § 27A-.2922).

of-kin (*Judis* v. *Borg-Warner Corporation,* 339 Mich
313; *Rytkonen* v. *City of Wakefield,* 364 Mich 86;
*Mooney* v. *Hill,* 367 Mich 138).

Beginning with the dissent of Justice Talbot
Smith in *Courtney* v. *Apple,* 345 Mich 223, 237, this
Court has steadily moved away from the proposition
—from which Justice Talbot Smith recoiled in that
case—that the value of the life of a child or of any
human being is such that there can be a recovery
for funeral expenses and nothing more.

With *Wycko* v. *Gnodtke,* 361 Mich 331, a majority
of this Court clearly recognized an expanded view
of pecuniary damage as stated by Justice Talbot
Smith (pp 338–340):

"What, then, is the pecuniary loss suffered because
of the taking of the child's life? It is the pecuniary
value of the life. We are aware, of course, that there
are those who say that the life of a human being is
impossible to value, that although we will grapple
mightily with the value of the life of a horse, of a
team of mules, we will stand aloof where a human
is concerned and assign it no value whatever. This
kind of delicacy would prevent the distribution of
food to the starving because the sight of hunger is
so sickening. But we cannot shirk this difficult
problem of valuation. In the case coming to us a
life has been taken and it is our duty, as best we
can, to put a fair valuation on it. In so doing, we
will keep in mind that the act is remedial in its
character and our duty is to construe it liberally in
favor of the beneficiaries.

"The pecuniary value of a human life is a com-
pound of many elements. The use of material anal-
ogies may be helpful and inoffensive. Just as with
respect to a manufacturing plant, or industrial ma-
chine, value involves the cost of acquisition emplace-
ment, upkeep, maintenance service, repair, and reno-
vation, so, in our context, we must consider the
expenses of birth, of food, of clothing, of medicines,

of instruction, of nurture and shelter. Moreover, just as an item of machinery forming part of a functioning industrial plant has a value over and above that of a similar item in a showroom, awaiting purchase, so an individual member of a family has a value to others as part of a functioning social and economic unit. This value is the value of mutual society and protection, in a word, companionship. The human companionship thus afforded has a definite, substantial, and ascertainable pecuniary value and its loss forms a part of the 'value' of the life we seek to ascertain."

The human companionship of which Justice TALBOT SMITH spoke was testified to most eloquently in this case by the mother and father of Linda Kay Hopkins:

"*Q.* And are you the mother of the deceased Linda Kay Hopkins?

"*A.* Yes.

"*Q.* Could you tell us what the age of Linda was on July 20, 1960?

"*A.* She was 21 years old at that time.

"*Q.* And when had she become 21?

"*A.* August 24th, the year before. She would have been 22 in August.

"*Q.* The month following?

"*A.* Yes, following her death.

"*Q.* At the time of her death, Mrs. Hopkins, what was her occupation?

"*A.* She was a student at Michigan State, working on her business administration degree.

"*Q.* How long did she have yet to obtain her business administration degree at Michigan State?

"*A.* It would have been about 2 weeks. She would have been through as soon as the first summer term was over. She would have been through then and had her degree.

"*Q.* Up to that point, Mrs. Hopkins, had she qualified?

"*A.* She had qualified as a graduate and had graduated in the spring as a graduate, but she did not have her degree yet. It was because she had changed her course from retailing to business administration.

"*Q.* Was there a degree for business administration awarded to her at any time?

"*A.* Yes, it was awarded posthumously to her.

"*Q.* On July 20, 1960, Mrs. Hopkins, did you have any other children?

"*A.* No, we did not.

"*Q.* She was the only child?

"*A.* Yes. I was unable to have any other children.   * * *

"*Q.* At the time of Linda Kay Hopkins' death, other than when she was attending school, where did she live?

"*A.* Well, she always lived home with us, Mr. Cicinelli, when she wasn't in school.

"*Q.* At the time of her death, Mrs. Hopkins, was she a single or married person at that time?

"*A.* She was single and she was not engaged to anyone.

"*Q.* Was she going steady with any boy friend?

"*A.* No, she wasn't at that time.   * * *

"*Q.* And what type of student would you say generally she was?

"*A.* She was a very good student.

"*Q.* And how would you describe the type of daughter, type of individual, type of person that she was?

"*A.* We thought that she was pretty wonderful. While we were very sad that we couldn't have any other children, I just thanked God every day that I had her, because I thought she was just about everything you would want.

"*Q.* Was she obedient?

"*A.* Yes (Crying). I'm sorry. (Pause.)

"*Q.* What was her health generally at the time of her death?

"*A.* Her health was very good at the time of her death. She had had allergies from the time she was a little girl, asthma. We spent a good many years trying to find out what caused it, the allergies. By the time she was 18, by that time we had things under control and from then on she was a very healthy girl. As a matter of fact, she was cheer leader at Michigan State, one of them, and she would have to be healthy to do that.

"*Q.* That would be in reference to her athletic activities?

"*A.* Yes, at football games.

"*Q.* Was that during all the time she was there?

"*A.* During 3 years that she was there, yes. She was a very good girl. We never had any trouble with her at all.

"*Q.* Did she engage in any church activities?

"*A.* She went to church every Sunday. She even did at college, which a lot of youngsters don't do. She was very much a Christian. She didn't drink or smoke, which a lot of girls of her age do. In fact, I thought we did a pretty good job of raising her.

"*Q.* No further questions.

"*The Court:* Do you have any cross-examination, Mr. Smith?

"*Mr. Smith:* I think not."

The relationship was testified to by the father as follows:

"My daughter has been engaged in—was engaged in our business. She was graduating in the business administration school at Michigan State College. I had hoped she would come into the business and I had had every indication from her that she would. When you have one child and,—such as we had, my wife and I don't have too much of a family, all we had was her, all that we were accumulating we hoped she would take over, and we hoped she would be able

to run the business successfully, and she had worked in the business from the time that she—oh, probably from the time she was around 12 years old. She had worked in various capacities in my business as to what a child could do, partly because we thought it was good training for a child and partly because I wanted her to see all of our operations and to grow up with all of the various operations in my business preparatory to eventually taking it over.

"*Q.* Generally, so the record will show it, what type of business were you operating and had been operating at that time?

"*A.* We had 3 businesses we were operating at that time. There was the printing business, there was a corporation engaged in the rental of properties and there was a retail store."

In *Thompson* v. *Ogemaw County Board of Road Commissioners,* 357 Mich 482, Justice EDWARDS writing the majority opinion stated as to consideration of pecuniary injury after the 21st birthday (p 489):

"A large majority of State courts hold that recovery may be had for the loss of benefits reasonably to be expected after the majority of the deceased. *Inspiration Consolidated Copper Co.* v. *Bryan,* 35 Ariz 285 (276 P 846); *Bohrman* v. *Pennsylvania R. Co.,* 23 NJ Super 399 (93 A2d 190); *Foerster* v. *Direito,* 75 Cal App 2d 323 (170 P2d 986). See, also, *Van-Cleave* v. *Lynch,* 109 Utah 149 (166 P2d 244); annotation, 14 ALR2d 485, Measure and elements of damages for personal injury resulting in death of infant.

"We do not believe that the age of the child at death (whether before or after majority) is decisive as to consideration of loss of possible future support after the 21st birthday. Nothing in the Michigan statute pertaining to wrongful death suggests such a distinction."

Why age 21 should set up a magic barrier baffles understanding in view of the total omission from the

statute[2] of any statement of limitation as to age. The appellant, significantly, speaks of "the death of an *adult* child." Linda Kay Hopkins, born August 24, 1938, was killed July 20, 1960. The defendant drove past a stop sign and struck her automobile while it was traveling on a through road. To say that her parents' loss from her death would cease after August 24, 1959, is all that is needed to expose the falsity of that proposition.

In view of *Wycko* and *Thompson,* the court did not err in its award of damages for loss of society and companionship.

## II.

But, it is argued, even if the wrongful death statute permits recovery, the probate code, PA 1939, No 288, ch 2, § 115 (CL 1948, § 702.115 [Stat Ann 1962 Rev § 27.3178(185)]), does not, and the probate code, it is contended, is controlling. We do not regard this action, brought under the wrongful death statute, as being governed by the probate code. In any event, that question is not before us in this case and we decline to pass upon it at this time.

## III.

The third question presented is whether the award of $26,500 should have been reduced to its present worth. The finding of the court reads as follows:

"In addition to the reimbursement for expenses, this court holds that the compensation for loss of society and companionship should be $1,000 per year for the average expectancy of the deceased's parents. In other words, $26,500."

The parents had an average life expectancy of 26.5 years. The finding of the court that the award should

2 PA 1925, No 146, as amended (CL 1948 and CLS 1961, § 401.1 *et seq.* [Stat Ann 1960 Rev § 16.121 *et seq.*]).

be at the rate of $1,000 per year and the total award of $26,500 oblige us to conclude that the trial court failed to reduce the award to present worth. It was held error in *Nagi* v. *Detroit United Railway,* 231 Mich 452, to instruct a jury to give prospective damages, not reduced by computation of present worth. Here, it was error on the part of the judge to fail to make such reduction.

## IV.

The final question raised by the appellant is whether the court erred in awarding interest from the date of death. It is the claim of the appellant that, since this is an action founding in tort, interest does not run on the unliquidated claim. Such is not the rule. The problem has recently been analyzed in the case of *Wilson* v. *Doehler-Jarvis Division of National Lead Company,* 358 Mich 510, 519, wherein an award of interest was allowed "from the date compensation would have been due had it been paid voluntarily." Where a claim accrues as of a certain date and can be ascertained or computed as of that date, we think the better rule is to award interest upon the claim from that date forward. *Larsen* v. *Home Telephone Co.,* 164 Mich 295. In this case the total injury and whatever award was to be made therefor accrued with the death of Linda Kay Hopkins. From that date forward, it is proper that the defendant should pay interest in order that there may be a full award of damages. Certainly, if prospective damages are to be reduced to present worth, it is equally just that damages which have accrued should carry interest from the date of accrual, whether that date be death or otherwise.

In this case, tried to the court, it did not err in awarding interest from date of death on those damages which accrued at death. While unnecessary to

this decision, it follows that, in the event of a jury trial, a jury should be instructed to ascertain the date when damages accrued and to add interest on same from date of accrual to date of its verdict, even as, in the reverse situation, a jury is instructed 'to reduce future damages to present worth.

## V.

Appellee, by cross appeal, contends that, since the trial judge allowed only the funeral bill and an amount to compensate the parents for the loss of the society and companionship of their daughter, it is clear he did not include in his award as an element of damages any sums for loss of investment in the deceased, loss of services, or exemplary or punitive damages. As Justice TALBOT SMITH observed in *Wycko* v. *Gnodtke, supra,* (p 339), a human life is a compound of many elements. In the search for the elements of a particular life a jury might consider "expenses of birth, of food, of clothing, of medicines, of instruction, of nurture and shelter", and "value to others as part of a functioning social and economic unit. This value is the value of mutual society and protection, in a word, companionship." We would not necessarily limit the elements to those mentioned by Justice TALBOT SMITH, but, where applicable, certainly all should be included in the verdict. The trial judge's award appears to have left out of consideration any element other than *future* companionship of the daughter of which the parents were deprived. If this be true, as can readily be determined upon remand, then such additional damages should be assessed as were not considered by him.

## VI.

With regard to the matter of exemplary or punitive damages, as was noted by Justice BLACK in

*Burns* v. *Van Laan,* 367 Mich 485, 493, this is a statutory action. There is no provision in the statute for an award of exemplary or punitive damages. None should be awarded.

The case is remanded to the trial court for further proceedings in accordance with this opinion. Both parties having prevailed in part, no award of costs shall be made to either party.

T. M. Kavanagh, C. J., and Souris and Smith, JJ., concurred with Adams, J.

O'Hara, J. (*concurring*). I concur in Mr. Justice Adams' result because I agree with Circuit Judge Zick, as he is quoted by Mr. Justice Kelly in *Reisig* v. *Klusendorf,* 375 Mich 519, 522 "That the *Wycko Case*\* overruled all of the prior cases and set up an entirely new standard for the determination of pecuniary loss in death cases" in order to include therein an element of recovery which had not previously been recognized in this State. The decision in that case, now part of our jurisprudence, has been presumptively known to the legislature at the very least since 1960.

The sword of presumptive legislative notice of judicial decisions cuts both ways. If it is a valid concept in the maintenance of the status quo, as this Court held for many years when change was advocated, it must be equally valid when change becomes a judicial *fait accompli*. See generally, 50 Am Jur, Statutes, § 326, p 318; 21 CJS, Courts, § 214, pp 388–390 and *Twork* v. *Munising Paper Co.,* 275 Mich 174; *In re Clayton Estate,* 343 Mich 101; *Consumers Power Co.,* v. *County of Muskegon,* 346 Mich 243; *Sheppard* v. *Michigan National Bank,* 348 Mich 577.

---

\* *Wycko* v. *Gnodtke,* 361 Mich 331.—Reporter.

If the legislature had found *Wycko* inconsonant with legislative intent, it has had ample opportunity to amend the act to declare explicitly and precisely what elements of damage are included or excluded from "pecuniary loss."

I do not agree that interest should be allowed on the judgment from the date of death. Automobile negligence cases should be able to be defended both as to liability and amount of damage without the peril of interest being added to a plaintiff's judgment.

BLACK, J. (*dissenting*).

"When the legislature has spoken, and declared one interest superior to another, the judge must subordinate his personal or subjective estimate of value to the estimate thus declared. He may not nullify or pervert a statute because convinced that an erroneous axiology is reflected in its terms." Cardozo, The Growth of the Law, pp 94, 95.

The honor of the Court is at stake here. This case and its companions[1] are due to result, either in a disreputable abuse of the judicial power, or in enough of that judicial self-restraint which from tripartite beginnings has been the only effective means of enforcing a key commandment of the Constitution; the one which directs that no department shall exercise or usurp the powers belonging properly to another. See Const 1835, art 3; Const 1850, art 3, § 2; Const 1908, art 4, § 2; Const 1963, art 3, § 2. By due performance of that commandment we have fended off executive as well as legislative attempts to invade or control the judicial department. *By it the judiciary is responsible to no less degree for the protection of the other departments from judicial appropriation of their respective powers.*

---

[1] *Reisig* v. *Klusendorf*, 375 Mich 519, and *Heider* v. *Michigan Sugar Company*, 375 Mich 490.

In this case, as in the *Reisig Case*, the starkly
stripped question is whether the Court is going to
amend—yes, the word is "amend"—the simply writ-
ten, universally understood, and unanimously ap-
plied[2] phrasing of a century and seventeen year old
statute, together with the similarly phrased and
purposefully supportive 1939 counterparts of that
statute. This time we shall sign after having been
warned that decision must be reached with specific
regard for the established postulate that "In con-
struing a statute, we are to construe it in the light
of the circumstances existing at the date of its en-
actment, not in the light of subsequent develop-
ments." (*Wayne County Road Com'rs* v. *Wayne
County Clerk*, 293 Mich 229, 235.)[3] And this time
we cannot avoid facing what was legally and fac-
tually inconsequent in *Wycko* v. *Gnodtke*, 361 Mich
331, that is, the specific dependency provision which
was included in the probate code of 1939 (CL 1948,
§ 702.115 [Stat Ann 1962 Rev § 27.3178 (185)]).
Such dependency provision is one of the counter-
parts to which reference has been made.

---

[2] Ever since the unanimous handing down of 1885 *Staal* v. *Grand
Rapids & I. R. Co.*, 57 Mich 239; 1886 *Mynning* v. *Detroit L. & N. R.
Co.*, 59 Mich 257; and 1889 *Van Brunt* v. *Cincinnati, J. & M. R. Co.*,
78 Mich 530.

[3] This rule for ascertainment of meaning and intention would seem
to be particularly applicable when a standing statute enacted in an
earlier day comes to judicial scrutiny. We apply it in respect to deeds
(*Rumrell* v. *Mingus*, 350 Mich 571), contracts (*Dakin* v. *Dakin*, 97
Mich 284) and wills (*Tuxbury* v. *French*, 41 Mich 7). As for stat-
utes it was written first in *Platt* v. *Union Pacific R. Co.*, 99 US 48,
63, 64 (25 L ed 424, 429). Thereafter it became standard text for
Ruling Case Law (quoted in the *Wayne County Road Com'rs Case*
at pp 235, 236) and American Jurisprudence (50 Am Jur, Statutes,
§ 236, p 224, "Meaning of Terms as of Time of Enactment"). The
rule appears in *Platt* at 63, 64:

"There is always a tendency to construe statutes in the light in
which they appear when the construction is given. It is easy to
be wise after we see the results of experience. * * * But in
endeavoring to ascertain what the Congress of 1862 intended, we
must, as far as possible, place ourselves in the light that Congress
enjoyed, look at things as they appeared to it, and discover its pur-
pose from the language used in connection with the attending cir-
cumstances."

Now we are obliged to say either (a) that the legislature intended from an 1848 beginning, and so intended in 1873 and finally by the presently considered enactments of 1939, to provide in the wrongful death statute a damage-measure by which the parents of a wrongfully taken adult daughter (parents making no claim of contributions by such daughter or of dependency on her in fact) may recover and have distribution to them of damages for loss of their daughter's companionship, or (b) that the legislature did not so intend. Justice ADAMS and his votaries, by a new and more bounteous construction of the wrongful death statute, made as they confess by and according to the mores of today, allege that these parents may so recover. I hold they may not, stressing—that it not be forgotten in this melee of words—that the instant suit was brought exclusively under, and so is circumscribed by, the unitary statutes of 1939 the Brethren would alter.

*First:. In this suit for wrongful death, may the court accommodate plaintiff's claim for loss of companionship?*

We are concerned here with section 2 only of the wrongful death statute,[4] conjoined as it is with the cited dependency provision of the probate code, and application thereof to due test of plaintiff's contention that he may, allegation and proof considered, recover and distribute to these parents damages for loss of their deceased adult daughter's companionship.

The combined legislative and judicial history of section 2 of the act forecloses all but absonant argument for the proposition that this plaintiff has proved that someone suffered "pecuniary injury," or that anyone was a dependent of the decedent. The foreclosure became final long ago, and was legis-

---

[4] CL 1948, § 691.582 (Stat Ann § 27.712). For current provisions see CLS 1961, § 600.2922 (Stat Ann 1962 Rev § 27A.2922).—RE-PORTER.

latively adjudicated later on when, by the said dependency provision, it was ordained that damages for "pecuniary injury," if and when recovered, should be distributed "only to those persons who were dependents of the decedent."

Our wrongful death statute was adopted in 1848 (Laws of Michigan 1848, No 38). The first amendment thereof appeared in 1873 (PA 1873, No 94). The last amendment was in 1939 (PA 1939, No 297). Without any change, the legislature incorporated the statute in the RJA of 1961. See PA 1961, No 236, § 2922 (CLS 1961, § 600.2922 [Stat Ann 1962 Rev § 27A.2922]). So much for the record of enactment of the legislatively maintained damage-measure, "pecuniary injury resulting from such death."

Now it may be true that the statute was "barbarous" when first enacted in 1848. (At that time even a husband, shorn wrongfully of his dutiful wife's services, was under the statute ineligible as a beneficiary. *Hyatt* v. *Adams*, 16 Mich 180, 195.) It may be that the legislature and this Court were unitedly cruel, in enacting and upholding the above damage-measure, from 1873 through the enactments of 1939 and on to 1948, when *Baker* v. *Slack*, 319 Mich 703, was handed down. Cruel or not, the legislature and the Court through all these years have made it fourth-grade plain that the statute provides a right of action for "pecuniary injury" only, on behalf of surviving next of kin proving such "pecuniary injury," and that loss of companionship suffered by nondependents of the decedent is not "pecuniary injury."[5] Hence, when one says that a statute is cruel in specific applications thereof, such an observation provides no ground for judicial amendment of that

---

[5] See quotations, post pp 468, 469, from the *Staal, Mynning, Van Brunt,* and *Nelson Cases,* the ensuing legislative history of the death act and its 1939 loophole-closers, and the citations Justice ADAMS quotes and criticizes as "a part of our barbarous past."

statute. The legislature, just so long as it infringes no constitutional provision, may be as "barbarous" as it wishes in the enactment and re-enactment of statutes.

The statute is officially cited now as CLS 1961, § 600.2922 (Stat Ann 1962 Rev § 27A.2922). Historically it is known as Lord Campbell's act.[6] Now we refer to it as the wrongful death statute. Continuously since 1848 the pivotal and presently attacked damage-measure thereof—"pecuniary injury resulting from such death"—has remained as it now stands. During all these years the legislature made no pertinent modification or amendment of the statute save only as was done by the unitary enactments of 1939. Then the damage-measure of section 2 came not to loosening but to express tightening when, prodded as it was by 1938 *Venneman* (286 Mich 368),[7] the legislature amended section 2 of the act and, at the same time, included new sections 114 and 115 in chapter 2 of the probate code of 1939 (CL 1948, §§ 702.114, 702.115 [Stat Ann 1956 Rev §§ 27.3178 (184), 27.3178(185)]). Section 2 of the act and

─────────────

[6] For the British citation and quotation of Lord Campbell's act, see *Hyatt v. Adams,* 16 Mich 180, 193, 194. [See 17 Halsbury's, Statutes of England (2d ed), p 4.—REPORTER.]

[7] In the *Venneman Case (In re Venneman's Estate),* it was held that an adult son of the deceased husband and father, even though not a dependent of his father, was entitled to share with the decedent's dependent widow the proceeds of a consent judgment which had been obtained in the widow's suit for wrongful death. The Court said (pp 376, 377):

"Because of the statutory mandate, notwithstanding appellant is an adult and in no way dependent upon his father for support, he still is entitled to share in the distribution of the amount recovered. And this is true even though it be admitted that the son himself could have recovered no damages because he could show no pecuniary loss, and the only person who did suffer a loss was the widow.

"It may be admitted that the statutory provision as to distribution works a hardship and possible injustice to Mrs. Venneman, still we are compelled to follow the clear and express language of the law as enacted by the legislature. The wisdom of the statute is not a matter for the consideration of the court, but is wholly within the control of the legislature. 'The remedy for the condition is * * * a legislative, and not a judicial function.' *In re Aronowitz' Estate,* 151 Misc 746 (272 NY Supp 421)."

section 115 of the code limit recovery and distribution "only to those persons who were dependents of the decedent" (note that the section says "who *were* dependents"; not "who were or might in the future be dependents").

Section 2 of the act and section 115 of the code, having been enacted to a common purpose by the same assembly, are properly looked upon as unitary. See cases cited in footnote, *MacDonald* v. *Quimby,* 350 Mich 21, 35; also *United States* v. *Stewart,* 311 US 60, 64 (61 S Ct 102, 85 L ed 40) as follows:

"It is clear that 'all acts *in pari materia* are to be taken together, as if they were one law.' *United States* v. *Freeman,* 3 How (44 US) 556, 564, (11 L ed 724, 727). That these two acts are *in pari materia* is plain."

The factual context of this case, in the confines of which all of us will have written, is both undisputed and easy to relate. Exemplary Linda Kay Hopkins, an only child, unmarried, lavished by devoted parents with an excellent upbringing and education and about to receive a degree in business administration at Michigan State University, came to her death by defendant's wrongful act a few days short of her 22d birthday. It is not claimed that Linda Kay's surviving parents were dependent upon her—in fact or in law. Indeed, the proof shows that the matter of dependency was the other way around, that is, the parents were supporting Linda Kay and had been paying for her education. The Austin-Healy car she was driving on the fatal occasion had been bought for her by the parents. They had recently given her a vacation trip to Hawaii. Her part-time earnings from the businesses of the parents had been saved and now are a part of her estate.

There is, moreover, no proof or claim that plaintiff's decedent had "voluntarily assumed the per-

formance of a duty which might be regarded as a legal obligation," as in the wrongful death cases of *Richardson* v. *Detroit & M. R. Co.,* 176 Mich 413, 432; *Judis* v. *Borg-Warner Corporation,* 339 Mich 313; *Rytkonen* v. *City of Wakefield,* 364 Mich 86; and *Mooney* v. *Hill,* 367 Mich 138. Plaintiff's counsel in fact conceded during the trial:

*"Mr. Cicinelli:* I'll read it all. 'Plaintiff herein makes no claim for future money contributions of the deceased in this action; plaintiff concedes that no money contributions were being made by the deceased to her parents at the time of her death, and further concedes that the likelihood of future contributions would be extremely small; plaintiff does make claim for the remainder of the damages enumerated in paragraph 10 of the declaration.' "

Then, in furtherance of such concession, plaintiff's counsel have forthrightly opened the "argument" portion of their brief with this sentence:

"The basic issue presented in this appeal is whether or not the item of 'loss of society and companionship' may be compensated for under the Michigan death act as a 'pecuniary injury.' "

Now, to introduce head-on what is to follow, it is freely admitted that section 2 of the wrongful death act long since should have been amended so as to provide a deserving remedy for surviving parents, situated as are these parents of Linda Kay Hopkins. My aim, then, points not to the need for amendment but to *our* power or authority to thus amend. The point, a constitutional one, is simply that there are right ways to provide due or overdue remedies for manifest wrongs, and that judicial amendment or alteration of statutes is not one of them.

That the omission of the legislature to amend section 2 of the act as indicated, or to provide for like

surviving parents an independent remedy, has resulted in many—far too many—denials of justice, no one can deny. Particularly during recent decades, as Michigan's agricultural society, with its general reliance upon pastoral life linked to an eighth-grade education, has shifted to an industrial and technical economy requiring more and more graduate as well as undergraduate learning, parents as a rule[8] no longer command the pecuniary or pecuniarily measurable service of their children during minority. They are obliged to spend more on the child, during and usually beyond minority, to prepare him for a life of service in such new economy.

That devoted parents do scrape, save, and deny themselves to put that promising son or daughter on through college, is a verity known in particular to every veteran lawyer and judge. We have seen, in the course of experience with clients and litigants, too many cases where the continued iniquity of legislative limitation upon death act recovery, to "pecuniary injury" suffered by "dependents of the decedent," has left grieving and sometimes heavily mortgaged parents no remedy at all, even for recovery of altogether righteous investments they have made to better educate that near or over majority and wrongfully taken child. Yes, I agree with Justice ADAMS that a remedy, for the wrong done parents as in this case, is long since overdue. His remedy, though, is anarchy. It is judicial amendment of a valid statute. That we may not do, even though the statute has grown callous with the passage of time.

To the time of present writing there is no suggestion by Justice ADAMS that the result proposed by him stems from judicial interpretation of the enactments of 1939, or that the statutory phrase "pecuniary injury resulting from such death" was

---

[8] *Wycko* was a factual exception, as we shall see.

ambiguous or is now ambiguous, or that it is otherwise so doubtful as to call into play the interpretive process.   Nonetheless, looking ahead to possible "interpretation" of the quoted phrase by way of amendment of Justice ADAMS' proposed opinion, I record now some fair, if roguish, questions the Brethren standing for benevolent rather than barbarous view of the statute should be able to answer.

Just what legislative assembly intended that the enacted, re-enacted, generations-known, and currently effective composite, "pecuniary injury resulting from such death," should include and permit recovery of damages—of any nature whatever—on behalf of nondependent parents of a noncontributing adult child?   Was it the convocation of 1848?   If so, where is the evidence of such 1848 intent?   Or was it the assembly of 1873?   Why, as to that assembly?   Or was such intention evinced when the legislature amended the death act in 1939 and, at the same time, inserted said section 115 in the probate code?   If so, where is the evidence of 1939 intent to authorize such recovery?

These questions are most important when, as in the present case, judges assume to apply enactments or re-enactments voted by long since departed legislators.   Predictably, though, the Brethren standing for recovery by this plaintiff, of damages for loss of companionship, will be both wary and chary of direct answer to any one of them.   In such circumstances, let us look back over the admissible record. There may be, after all, conclusive evidence justifying but one answer; that the legislature in 1873 and again in 1939 left unanswerable proof of intent, (a) to leave the statutory measure "pecuniary injury" exactly as it was,[9] and (b) to limit recovery and

---

[9] This Court said so, expressly and forcefully, in 1948 *Baker* v. *Slack*, 319 Mich 703, 711, 714, 715.

distribution of damages for pecuniary injury "only to those persons who were dependents of the decedent."

When the legislature of 1873 considered amending and did amend the wrongful death statute, that body had before it the most recent official compilation of Michigan statutes; the Compiled Laws of 1871. In that compilation the death act appeared on a single page. That page is herewith reproduced.

## CHAPTER CCXII

### THE ACTION FOR CAUSING DEATH BY WRONGFUL ACT, NEGLECT, OR DEFAULT.

An Act requiring compensation for causing death by wrongful act, neglect, or default.[1]

*[Approved February 12, 1848. Took effect April 12, 1848. Laws of 1848, p. 31.]*

(6724.) SECTION 1. *Be it enacted by the Senate and House of Representatives of the State of Michigan,* Whenever the death of a person shall be caused by wrongful act, neglect, or default, and the act, neglect, or default is such as would (if death had not ensued) have entitled the party injured to maintain an action, and recover damages, in respect thereof, then and in every such case, the person who, or the corporation which would have been liable, if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death shall have been caused under such circumstances as amount in law to felony.

(6725.) SEC. 2. Every such action shall be brought by, and in the names of, the personal representatives of such deceased person, and the amount recovered in every such action shall be for the exclusive benefit of the widow and next of kin of such deceased person, and shall be distributed to such widow and next of kin in the proportions provided by law in relation to the distribution of personal property left by persons dying intestate; and in every such action, the jury may give such damages as they shall deem fair and just, with reference to the pecuniary injury resulting from such death, to the wife and next of kin of such deceased person.

[1] For similar provisions in the general railroad act, see sections 2650, 2651, and sections 2449 and 2450.

In those days, and continuing through the compilation of 1915, the legislature had ordered that extant court decisions, construing and applying the statutory language, appear in the compilation by marginal citation and reference. As a glance at the reproduced page will show, a list of cited decisions appeared at the left margin of section 2, headed "By whom suit is to be brought, for whose benefit, and measure of damages." One of the cited cases was *Tilley* v. *Hudson River R. Co.* The *Tilley Case,* reported twice (24 NY 471 and 29 NY 252), was then the first of a long line holding that "pecuniary injury resulting from such death" excludes "those losses which result from the deprivation of the society and companionship of relatives, which are equally incapable of being defined by any recognized measure of value" (*Tilley,* 24 NY at 476). Following *Tilley* later, the Supreme Court said, in the *Vreeland Case* (227 US at 71):[10]

"In *Tilley* v. *Hudson River R. Co.* 24 NY 471, and 29 NY 252, the court stated that 'the word "pecuniary" was used in distinction to those injuries to the affections and sentiments which arise from the death of relatives, and which, though grievous and painful to be borne, cannot be measured or recompensed in money. It excludes, also, those losses which result from the deprivation of the society and companionship, which are equally incapable of being defined by any recognized measure of damages.' "

So much for legislative intent in 1873. Now will someone say that the assembly that year, when it amended section 2 so as to enlarge the statutory class of beneficiaries eligible to claim and prove "pecuniary injury resulting from such death," intended to

[10] *Michigan C. R. Co.* v. *Vreeland* (1912), 227 US 59 (33 S Ct 192, 57 L ed 417).—REPORTER.

permit recovery by *any* eligible beneficiary *of damages for loss of companionship?* And if someone still wants to play quibbler's facticide, let him read first these serious answers, recorded when the amendment of 1873 was fresh in the view of Judges who were around to personally witness, or at least understand better, the legislative purpose.

*Staal* v. *Grand Rapids & I. R. Co.,* 57 Mich 239, 246:

"Courts should not allow juries to give anything that goes beyond a fair pecuniary compensation based on the actual pecuniary loss."

*Mynning* v. *Detroit, L. & N. R. Co.,* 59 Mich 257, 262:

"The claim made by the plaintiff is a statutory one: How Stat § 8314. The above charge contains several elements for the consideration of the jury, on the subject of damages, which are improper. They are outside of the statute. It will be noticed that the language of the statute includes only such damages as may be recompensed by pecuniary compensation, not exceeding the statutory amount; and which should be based upon some well-defined facts or known circumstances in the case,—such facts as are susceptible of some proof under the well-settled rules governing the admissibility of testimony. The mental sufferings and injured feelings, or any other injuries which are not susceptible of being compensated by a money consideration to those who are entitled to the benefit of the statute, are therefore necessarily excluded as elements to be taken into consideration by the jury in determining the amount of damages in this class of cases: *Chicago & N. W. R. Co.* v. *Bayfield,* 37 Mich 205 (16 Am Neg 87); Rorer on Railroads, pp 860, 1167; Thompson, Negligence § 1289; 2 Sedgwick, Damages, § 537; *Board of Com'rs* v. *Legg,* 93 Ind 523 (47 Am Rep 390)."[11]

---

[11] Note that the charge criticized in *Mynning* authorized the jury to assess damages, not only for loss of services but for loss of

*Van Brunt* v. *Cincinnati, J. & M. R. Co.,* 78 Mich 530, 538:

"We have always held in these actions—although it may be, as claimed by plaintiff's counsel, that the difference between the two sections 3392 and 8314 has never been specially called to our attention before—that the damages must—

" 'Be based upon some well-defined facts or known circumstances in the case,—such facts as are susceptible of some proof under the well-settled rules governing the admissibility of testimony.' *Mynning* v. *Detroit, L. & N. R. Co., infra.*

"And that the damages must be given in reference to pecuniary injury; and that any injuries that are not susceptible of being compensated by a money consideration must be excluded as elements to be taken into consideration by the jury in determining the amount of damages in this class of cases. *Mynning* v. *Detroit, L. & N. R. Co.,* 59 Mich 257, 262; *Chicago & N. W. R. Co.* v. *Bayfield,* 37 Mich 205 (16 Am Neg Cas 87); *Cooper* v. *Lake Shore & M. S. R. Co.,* 66 Mich 261 (11 Am St Rep 482); *Balch* v. *Grand Rapids & I. R. Co.,* 67 Mich 394; *Rajnowski* v. *Detroit, B. C. & A. R. Co.,* 74 Mich 20."

*Nelson* v. *Lake Shore & M. S. R. Co.,* 104 Mich 582, 585:

"The compensation provided by the statute is strictly pecuniary. There can be no compensation for grief, loss of companionship, wounded feelings, or suffering, either of the deceased or of the beneficiaries, and the court so charged the jury."

Now when the legislature proceeds to re-enact a long since matured and consistently court-applied (here for the 75 years between 1873 and 1948 [when *Baker* v. *Slack* was decided]) statutory phrase or provision, and the senators and representatives can-

---

*companionship.* The complete charge, held reversible, appears on pages 261 and 262 of the report.

not rely upon the Court's word thus simply, repeated-
ly and unanimously delivered, what must these legis-
lative officers do to insure retention in our quarters
of the integrity of that which they want preserved?
Must the legislature, formally and regularly, com-
municate such retentive desire to the Court? Has
the Court grown so obtuse as to require such regular
communication lest it stray from its own pronounce-
ments anent statutes? Getting down to cases, was
it essential to the preservation of this 117-year old
statutory damage-measure that the legislature have
included such preservative intent at the end of PA
1939, No 297? Really, should this "all too easy-going
tendency in our midst to overrule long-since settled
and unanimous but unsatisfactory constructions of
standing statutes" (dissent, *People v. Holbrook,* 373
Mich 94, 101) continue much longer, it would not be
surprising at all to find, at the foot of some page of
new public acts, a message like this:

"Memo to the Supreme Court: These words are
intended by the legislature to mean exactly what you,
by unanimous vote, have repeatedly said they mean."

If it is necessary to discuss further the legislative
purpose for application to cases as at bar, consider
the *Venneman Case,* previously quoted. That deci-
sion was handed down November 10, 1938. It caused
quite a stir, as all trial practitioners of that time
will recall, and galvanized the legislature into sur-
prisingly prompt action. The Court's open sugges-
tion (p 377) that the legislature should proceed cor-
rectively was acted upon at the very next session.
The wrongful death statute was amended to provide
for a circuit court certificate of distribution and said
section 115 was added to the probate code. Said
section 115, in effect today as enacted then, speaks a
purpose one can hardly deny. It reads, relevant to

our issue (CL 1948, § 702.115 [Stat Ann 1956 Rev § 27.3178(185)]):

"Sec. 115. The proceeds of any settlement of a cause of action for wrongful death, or the proceeds of a judgment recovered in an action for damages for wrongful death, *shall be distributed in such manner, to such persons, and in such amounts as hereinafter set forth:*

"(1)    *    *    *

"(2)    *    *    *

"(3)    *    *    *

"(4) After hearing on the petition of the executor or administrator, the probate court shall enter an order distributing such proceeds *only to those persons who were dependents of the decedent* and in such amounts as to said court shall seem fair and equitable considering the relative damages sustained by *each of such dependents* by reason of the decedent's wrongful death: Provided, however, That if the proceeds which are to be distributed are proceeds of a judgment recovered in a court *which has issued a certificate, as may be provided by law, relative to the damages sustained by each of such dependents,* distribution of such proceeds shall, in the absence of written objections thereto filed by any interested party following service of notice as required by this section, be ordered in accordance with such certificate." (Emphasis supplied.)

The legislature wanted to make sure that only those persons who were legally or factually dependent upon the decedent for prospective services, prospective support, or continuity of contributions toward support should receive damages for "pecuniary injury."

A situation, similar to that which came to exposition in Michigan by the *Venneman Case,* developed later in Illinois. Prior to a 1955 amendment of the Illinois wrongful death statute "it was held that lineal next of kin were presumed, in a wrongful death

case, to have suffered a pecuniary loss entitling them to substantial damages without proof of actual loss, and that this presumption was a substantive element added by the courts by construction to the wrongful death act." (Quotation from *Rust* v. *Holland,* 15 Ill App 2d 369, 373 [146 NE2d 82, 84, 67 ALR2d 739].) The Court in the *Rust Case* speaks from here:

"The legislature, by the 1955 amendment made to section 2, intended to change the manner of the distribution of the proceeds arising out of a wrongful death action. Prior to the amendment, the amount recovered through suit, or by settlement, was distributed as intestate property among the decedent's widow and next of kin. Now the statute provides that the amount recovered by suit or settlement, is to be distributed on the basis of the actual dependency 'of the widow and next of kin of such deceased person in the proportion, as determined by the court.' The word 'dependency' implies a present existing relation between two persons where one is sustained by another or looks to or relies on the aid of another for support or for reasonable necessaries consistent with the dependent's position in life."

The conclusion reached by the court was:

"In the instant case, the evidence showed that the widow and the two Rust children were completely dependent upon the decedent for their support and that the two Carr children were not dependent upon him for support, and, further, that appellants had no reasonable expectation of any pecuniary benefit as a result of the continuation of his life."

Here, in paraphrase, it may be said that it was the intention of the legislature, by the 1939 enactments, to change the mode of distribution of any sum recovered under the death act as "pecuniary injury"

so as to make sure that such sum "is to be distributed on the basis of the actual dependency" of beneficiaries eligible under the statute to receive such distribution.

But recently, as in *Poff* v. *Pennsylvania R. Co.,* 327 US 399 (66 S Ct 603, 90 L ed 749), the Supreme Court had occasion to consider a question under the Federal employers liability act (45 USC, § 31) similar to that which was decided in *Rust.* In *Gillespie* v. *U. S. Steel Corporation,* 379 US 148 (85 S Ct 308, 13 L ed 2d 199), eligibility of a brother and sisters to have recovery under the FELA and the Jones act, 46 USC, § 688, along with the decedent's widow, was involved. The Court refused to overrule the *Wells-Dickey Case (Chicago, B. & Q. R. Co.* v. *Wells-Dickey Trust Co.,* 275 US 161 [48 S Ct 66, 72 L ed 218]), and referred to the *Poff Case,* which last found that congressional "emphasis on dependency suggests that Congress granted the right of recovery to such next of kin as were dependent on the deceased." For further elaboration, see the writer's reference to and application of *Poff's* principle in *MacDonald* v. *Quimby,* 350 Mich 21, 37.

There are more questions, which if brought here would test acidly the idea that parents, as at bar, may under the statute recover damages for loss of an adult daughter's future companionship. Some were pertinently suggested by the discourse appearing in *Hyatt* v. *Adams,* 16 Mich 180, 197, in this particularly: If recovery is to be permitted on behalf of dependent next of kin for genuine pecuniary injury, and also on behalf of nondependent next of kin for loss of companionship, will the total amount recovered under the statute be apportioned according to the degrees of relationship of the dependent and nondependent beneficiaries? A like question, which is sure to arise between dependent next of kin suffering pecuniary injury and nondependent next

of kin suffering loss of companionship, is "who gets the proceeds?" Do all share equally? What if such proceeds are collectibly amount-limited, say to the minimally insured (by the financial responsibility act)[12] sum of $10,000, from which sum the funeral and burial expenses, and fees of counsel, have been necessarily deducted? Must the "dependents of the decedent" share the limited net proceeds with the nondependent sufferers of loss of companionship? Shades of *Venneman!* The legislature then will have accomplished nothing by the 1939 enactments and the deplored result of *Venneman* will have been reinstated.

Let us suppose, in conjunction with the above, that Linda Kay Hopkins, but a few weeks prior to her untimely death, had adopted an infant child. All other proof remaining the same except that gross recovery is limited to $10,000, would the legally dependent infant be compelled to share—even a dollar—of the net proceeds with these nondependent parents?

It seems to the writer that some of the consequences, of what is proposed, should be viewed before the Court approaches this warned and foreseeable brink; also, that we should consider the inevitable effect of such doings in another field of statutory law, that of workmen's compensation. Examine *Kalcic* v. *Newport Mining Co.,* 197 Mich 364; *Ormsbee* v. *Grand Trunk R. Co.,* 197 Mich 576; *Paperno* v. *Engineering Co.,* 202 Mich 257; and *Compton* v. *Ford Motor Co.,* 337 Mich 654. Some are wrongful death cases. Some are compensation cases. Some of each class refer to the other class for rules of dependency. *Compton* says (pp 656, 657):

---

[12] CLS 1961, § 257.501 *et seq.* (Stat Ann 1960 Rev § 9.2201 *et seq.*).

"Under the above section it clearly appears to be the policy of the legislature that no compensation will be paid to a widow after her remarriage or to a dependent child after he or she reaches the age of 21 years, if he or she is not physically or mentally incapacitated from earning. In *Garbutt* v. *Stoll,* 287 Mich 396, 399, we said:

" 'The compensation act does not contemplate support for any save the dependent and one who has sufficient means at hand for supplying present necessities, according to his position or station in life, is not a dependent.' "

Then, on pages 658 and 659, *Compton* concludes:

"In our opinion a person not within the class of those conclusively presumed to be dependents cannot refrain from using her ability to work and earn a living, and thereby make herself a dependent. It is also our opinion that where the facts are uncontroverted and but one inference can be drawn from such fact, the question of dependency becomes one of law for the court. In the case at bar, the legislation enacted clearly intended that a person more than 21 years of age, who is mentally and physically able to work and earn a living is not a dependent. It follows that the award must be vacated, with costs."

*Second: does the Wycko case hold more than that the jury's verdict for "pecuniary injury" was not excessive?*

*Wycko* v. *Gnodtke,* 361 Mich 331, was a suit for wrongful death of a provenly parent-serviceable 14-year-old boy. See Justice Talbot Smith's fact narration on page 333 and Justice Carr's like narration on page 344. All eight members of the Court knew —and agreed—that the case was one of abundant proof that the surviving parents, under the death act as that act has been known from the beginning, did on account of the boy's death suffer some or much pecuniary injury. So the sole question was whether

the amount allowed by the jury for pecuniary injury ($14,000) was excessive. Five of us, looking upon the jury as the best as well as the constitutionally appointed estimator of such pecuniary injury, thought it was not. Justices Carr, Dethmers, and Kelly wanted to reduce the amount to $7,500. Such was our difference of viewpoint, all expansive *dicta* written in *Wycko* to the contrary notwithstanding. No one denied or could deny that the boy's parents in law were dependent on him, within section 2 of the act and section 115 of the code, for the prospective services to which they were legally entitled. *That fact of dependency is, by concession of plaintiff, absent in the present case.*

Now, before proceeding further, let us examine certain writings of eminent jurists in earlier days.

"In the preparation of an opinion, the facts of the case are in mind. It is prepared with reference to such facts, and when considered in connection therewith, will generally be found satisfactory. When, however, an attempt is made to pick out particular parts or sentences, and apply them indiscriminately in other cases, nothing but confusion and disaster will be likely to follow. In other words, the opinion and decision of a court must be read and examined as a whole in the light of the facts upon which it was based. They are the foundation of the entire structure which cannot with safety be used without reference to them." *Larzelere* v. *Starkweather,* 38 Mich 96, 101.[13]

"Chief Justice Marshall, who delivered the opinion in the *Marbury Case*[14] speaking again for the court in the *Cohens Case*[15] said:

---

[13] See, to the identical point, cases and authorities collected in *McNally* v. *Wayne County Canvassers,* 316 Mich 551, 558.

[14] *Marbury* v. *Madison,* 1 Cranch (11 US) 137 (2 L ed 60).—Reporter.

[15] *Cohens* v. *Virginia,* 6 Wheat (19 US) 264, 399 (5 L ed 257, 290).—Reporter.

" 'It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated.' "  *Rathbun* v. *United States,* 295 US 602, 627 (55 S Ct 869, 873, 79 L ed 1611, 1618).

I am ready to concede, though, this case of Currie and like others (*Burns* v. *Van Laan,* 367 Mich 485 is a further example) reflectively considered, that *Wycko* is being taken as an unrestricted license for recovery and distribution of damages representing "the value of mutual society and protection, in a word, companionship" (*Wycko* at 339, 340), instead of the statutorily limited "pecuniary injury" suffered by "dependents of the decedent." That being so, *Wycko* should in peremptory fashion be restricted to what was actually held.

*Wycko* held that the jury's verdict in the sum of fourteen thousand of today's forty cent dollars was not excessive. All else in *Wycko,* going beyond the presented question of excessiveness of verdict, must be regarded as Marshall himself, in *Cohens* v. *Virginia,* regarded certain of his own general expressions in the earlier case of *Marbury* v. *Madison.* Adding this all up, and looking at *Wycko* again in the light of its apparently developing application in our trial courts to factual situations of nondependency, the writer ruefully confesses guilt of one specific error. He should have concurred in the

result only of *Wycko's* narrowly prevailing opinion.
Such is the wisdom of hindsight.

But to grips with the main question: Is *Wycko*
a precedent for what was done below; for what
Justice ADAMS would affirm? If it is, we must find
in the majority opinion a specific that fails to meet
the reader's eye. Where in the opinion is there any
reference to said section 115 of the code? Where
is there some indication of purpose that the opinion
be accepted as going beyond the immediate focal
of presumed pecuniary loss—the decedent being an
infant—and on to a *stare decisis* holding that sur-
vivors belonging to the statutory class who claim
loss of companionship only, are "dependents of the
decedent"? Here we perceive the insidious danger
of that doctrine, most recently pressed upon us by
the plaintiff in *Burns* v. *Van Laan,* 367 Mich 485,
493, that courts should "allow" a desirable remedy
as a "logical extension" of some factually inappli-
cable case. *Wycko* cannot, or at least should not,
be "extended".

Are we to hold, as a "logical extension" of *Wycko,*
that these parents *were* "dependents of the dece-
dent", though they were not? It is a sufficient an-
swer to say that *Wycko* does not answer the ques-
tion; hence is no precedent for this case. It did not
warn the legislature of any such "extension" and so
is no meat that feeds the rule of legislative "ac-
quiescence".[16]

Pertinently decisive is that difference of legal
relationship between parent and *minor* child on the
one hand and parent and *adult* child on the other.
As said in the *Vreeland Case* (227 US at 72):

[16] If there has been any such acquiescence, it lies in what was
more pertinently written, of statutory dependency as first requisite
of eligibility, in the 17-year-old *Baker Case* (319 Mich 703, 711–715);
not inapposite 4-year-old *Wycko.*

"The rule for the measurement of damages must differ according to the relation between the parties plaintiff and the decedent, 'according as the action is brought for the benefit of the husband, wife, minor child or parent of minor child, for the loss of services or support to which the beneficiary was legally entitled, or is brought for the benefit of a person whose damages consist only in the loss of a prospective benefit to which he was not legally entitled.' Tiffany, Death by Wrongful Act, §§ 158, 160, 161, 162."

Where a *minor* child has been wrongfully taken the law supplies a presumption that the surviving parents have suffered a "pecuniary injury," an injury which continues during the period between wrongful death, and attainment of majority had there been no death. But on the other hand, where an *adult* son or daughter has been wrongfully taken, the law supplies no presumption of pecuniary loss. In such case the plaintiff must supply direct proof that "pecuniary injury" was suffered by eligible beneficiaries if damages for such injury are to be recovered for and distributed to such beneficiaries as dependents of the decedent. No such proof was offered here, as the plaintiff concedes.

Now let us examine some of our earlier and, so far, unquestioned decisions. Refer first to *Black* v. *Michigan Central R. Co.,* 146 Mich 568; then to *Sceba* v. *Manistee R. Co.,* 189 Mich 308 and *Pratt* v. *Taxicab & Transfer Co.,* 225 Mich 147; and finally to the consideration of the *Black Case* which was given in *Crook* v. *Eckhardt,* 281 Mich 703. The *Sceba Case* is representative. Reversing as inadequate a verdict for the plaintiff in the sum of $71 (the amount of the funeral bill), the Court said (p 320):

"In the case of *Black* v. *Michigan Central R. Co.,* 146 Mich 568, this Court did not hold that such evidence, as above referred to, was not admissible, but

did hold that where evidence had been given as to the age, calling, and condition of health of the father, and of the age and condition of the mother, together with evidence that the child was healthy, intelligent, of a good disposition, and obedient to its parents, that was sufficient to authorize an award of substantial damages, and the court, in that case, refused to set aside a verdict of $1,500 damages. Justice Moore, who wrote the opinion of the court, after quoting the reasons of the circuit judge in his denial of a motion for a new trial, and after calling attention to the cases of *Parsons* v. *Missouri P. R. Co.,* 94 Mo 286 (6 SW 464), and *City of Chicago* v. *Hesing,* 83 Ill 204 (25 Am Rep 378), and other authorities, concluded his opinion in these words: * * *

"This case has since been cited with approval."

Then, on page 322, the rule was laid down which Justice Fellows, writing for the Court in the *Pratt Case,* considered and applied later. The rule, quoted from *Sceba* (p 322):

"It has been held by many courts, including those cited in the *Black Case,* that the law presumes, in the case of the death of a minor child by wrongful act, that there has been a loss for which compensation may be given under the statute, and that the loss may be estimated from the facts proven, in connection with the knowledge and experience possessed by all persons, in relation to matters of common observation. 8 RCL p 835, citing many cases."

In *Wycko* five of us wandered unnecessarily, from our rightful way, to bolster a verdict for pecuniary injury which required no underpinning made of loss of companionship. The verdict was sustainable by the proof as made and the aforesaid presumption. See particularly the discussion in *Pratt, supra* at 149–151. There, having quoted the general rule from

*Hurst* v. *Detroit C. R.,* 84 Mich 539, the Court proceeded (p 151):

"But in *Black* v. *Michigan C. R. Co.,* 146 Mich 568, the record was barren of evidence of the value of services or expense of maintenance of a minor, although there was evidence of the age, calling, and condition of the parents, and that the boy was healthy, intelligent and of good disposition. It was held to be for the jury to determine from their experience the amount of damages, and it was said:

" 'The jurors have all been boys. The average juror knows the conditions which surround a boy in a family like that of plaintiff. We think it cannot be said, as a matter of law, that there was no basis upon which to find a verdict for pecuniary loss.' "

## SUMMARY

1. Section 115 of the code was not involved, of necessity or otherwise, in *Wycko.* It was not even mentioned by the Court or by counsel. Why? Because the parents of John L. Wycko *were* legally dependent on their *minor* son for prospective services, the loss of which constituted "pecuniary injury" by force of adduced proof aided by the above legal presumption. Thus *Wycko* stands as no precedent here, the parents of this *adult* decedent not having established that they suffered "pecuniary injury" within said section 2 of the act or that they "were dependents of the decedent" within said section 115 of the code.

I adhere, then, to what was written for four members of the Court in *MacDonald* v. *Quimby,* 350 Mich 21, 34–37. That opinion of *MacDonald* preceded *Wycko,* by some three years. It was signed by Justice Talbot Smith, writer of *Wycko's* prevailing opinion, as well as by the present writer and Justices Edwards and Voelker. It is pretty fair evi-

dence that Justice TALBOT SMITH had no intention, when writing for *Wycko,* of working up a precedent which, to attain a result for nondependents as well as dependents, would ignore an integral part of what in *MacDonald* he had attested as unitary.

That same opinion of *MacDonald* confirmed the consolidated effect of the 1939 enactments, ruled as in the *Poff Case* that the statutory emphasis on dependency "granted the right of recovery to such next of kin as were dependent on the deceased," and concluded that the decedent's mother, *if dependent in fact* on him, was an eligible beneficiary. Too, it is a simple fact of continuant practice in our probate and circuit courts that the judicious blending together of the 1939 amendments of the wrongful death act, with that part of the 1939 probate code which is headed "settlement of death and survival actions — distribution of proceeds" (PA 1939, p 599), as done at the time by the legislature, left no doubt with anyone for nigh to a quarter century about this conclusion at least:

Pecuniary injury, within the wrongful death statute, meant what it meant before 1939, that is, monetary injury suffered by eligible survivors of the one wrongfully taken, also that the sole purpose of such enactments was to prevent, as in *Venneman,* the taking by nondependent survivors of that which belonged exclusively to dependent survivors.

Examine section 2 of the wrongful death act (PA 1939 p 688) to see how carefully the legislature provided for the certification (by the circuit court to the probate court) of the amount and date of judgment and for the preparation of an *advisory* "written opinion"—by the trial judge—respecting distribution of the amount recovered for pecuniary loss and the identity of the eligible distributees "as shown by the evidence introduced upon the trial of such case." Then came the legislative mandate to

the *probate court.* That mandate I emphasize, *appears in the wrongful death act as well as in the probate code.*

Copied from amended section 2 (PA 1939, p 688) it reads:

"After providing for the payment of the reasonable medical, hospital, funeral and burial expenses for which the estate is liable, the probate court shall determine *as provided by law* the manner in which the amount representing the total pecuniary loss suffered by the surviving spouse and next of kin shall be distributed, and the proportionate share thereof to be distributed to the surviving spouse and next of kin." (Emphasis added.)

Copied from said section 115 (PA 1939, p 600) the mandate reads:

"The probate court shall enter an order distributing such proceeds only to those persons who were dependents of the decedent and in such amounts as to said court shall seem fair and equitable considering the relative damages sustained by each of such dependents by reason of the decedent's wrongful death: *Provided, however,* That if the proceeds which are to be distributed are proceeds of a judgment recovered in a court which has issued a certificate, *as may be provided by law,* relative to the damages sustained by each of such dependents, distribution of such proceeds shall, in the absence of written objections thereto filed by any interested party following service of notice as required by this section, be ordered in accordance with such certificate."

In view of these legislatively tied Gordian knots, does anyone care to write—for the record—some reason why section 2 of the act may and therefore should be applied without regard for section 115 of the code, or that section 115 may and therefore

should be applied without regard for section 2? So far (we have had this case under consideration for more than a year now) no one seated here finds himself able to reply.

2. Justice ADAMS' opinion proceeds (division II):

"But, it is argued, even if the wrongful death statute permits recovery, the probate code, PA 1939, No 288, ch 2, § 115,  *   *   *  does not and the probate code, it is contended, is controlling."

This error should be challenged immediately before it enters our record. No one, either in brief or opinion, has presented any such contention, or anything like it. My contention, dating back to and set forth in 1957 (*MacDonald* v. *Quimby, supra*), may be gathered within and upon these terse sentences.

The 1939 enactments were worded in unison and tied together by the legislature on the same day.[17] That was direly due, then ink-fresh *Venneman* considered. The legislature, faced with the judicially upheld seizure, by a *nondependent adult,* of half the proceeds recovered on behalf of a *dependent widow* for "pecuniary injury" (*Venneman* at 376), was forced to act. To do so it was necessary to provide (in the new probate code as well as by amendment of the wrongful death act) that no one, not a "dependent," should have recovery of damages for pecuniary loss. As every veteran trial judge, probate judge and trial lawyer remembers, *Venneman*

---

[17] The probate code of 1939, said sections 114 and 115 included, and the 1939 amendments of the death act, were passed by the legislature on the same day, May 25, 1939. They were presented to Governor Dickinson on the same day, June 13, 1939. They were approved on the same day, June 20, 1939. Such are additional facts, indicative of the legislature's unitary purpose, which my Brethren are compelled to ignore as they apply their version of the death act only, to admitted exclusion of the effect of said section 115. (See 2 Senate Journal 1939, pp 1745, 1833, 1836, 1866, 1868, 1900, 1903.—REPORTER.)

made it necessary to close *Venneman's* loophole so that, whether amicable settlement of a right of action for wrongful death should be approved in probate, or whether judgment upholding such right should enter in circuit, "dependents" only should have recovery and thus stand eligible as distributees of the amount received for "pecuniary injury" or "pecuniary loss" (as amended section 2 of the act interchangeably refers thereto).

Thus no one claims that said section 115 of the code—alone—"is controlling." It *is* contended that *the unitary enactments of 1939* are controlling, and that they cannot be separated to permit recovery and receipt by nondependent survivors of that which section 2 of the act thrice refers to as "total pecuniary loss." Any judge or lawyer who cannot see this surely does his legal reading in that ever-darkened library of demisemi law; the place where the plain print of statutes is misreadably too fine.

3. The final and rather elemental reason these 1939 enactments must be looked upon and applied as one is that the 1939 legislature was compelled—by *Venneman*—to provide a uniform rule of recovery and distribution of damages for pecuniary loss no matter whether the amount received (a) should come by way of a circuit court judgment, or (b) whether it should come by way of an amicable and probate approved settlement. If such was not the legislative purpose (refer again to *Venneman*), then we must attribute to the 1939 assembly the idiotic intent of providing that a fiduciary may, by resorting exclusively to the death act, sue for, collect and distribute damages for "pecuniary injury" which the same fiduciary could not, even with agreement of the wrongdoer, obtain and distribute as provided in said sections 114 and 115 of the probate code. I join in no imputation, to departed legislators, of foolishness like that.

4. What today's usurpation of legislative power, by the judiciary, will do to contemporaneously rising liability insurance rates is visible for all to see. Loss of a decedent's companionship knows no "pecuniary" base and no evidentiary limit. Foreseeable are extravagant awards to those who, by the wrongful death of some relative, lose nothing beyond piously shed tears and so are unjustly enriched at expense of the premium-paying public. Thus the impending *result* of the case at bar will be of little moment. But the predictable impact of that *result,* upon the unrepresented public interest, is appalling. That is the main reason why legislation by legislators is in order rather than legislation by judges.[18]

Far better, if the justice of cases like this case of Currie is that impelling, that we create a common-law remedy, specially on the case, for parents situated as are those of Linda Kay Hopkins, rather than expand in every direction the measure of recovery and distribution which is provided by the 1939 statutory enactments. That we may honorably pro-

---

[18] A perfect example of wide open recovery, under the wrongful death act, is projected for us by *Heider* v. *Michigan Sugar Company,* 375 Mich 490. One need but examine the sordid record, in *Heider,* of total neglect and nonsupport of a deceased minor son (James D. Heider) by the administrator-father, *and the twice judicially adjudged reasons for such nonsupport,* to perceive where this Court will be headed by the opinions proposed by Justice ADAMS—for *Heider* as well as for this case of Currie.

The trial judge in the *Heider Case* felt that he had to identify the father-administrator of James D. Heider as a compensable loser of James D. Heider's companionship if pecuniary damages were to be awarded at all. There was no one else to compensate, according to the judge. He ruled:

"Inasmuch as the deceased James Heider apparently had no legal obligation to support his grandparents with whom he lived (CLS 1961, §§ 401.2, 401.5 [Stat Ann 1960 Rev §§ 16.122, 16.125]) or his half brothers or sisters (*Richardson* v. *Detroit and M. R. Co.,* 176 Mich 413, headnote 6) or his stepmother with whom he did *not* live (CL 1948, § 691.582 [Stat Ann § 27.712]; *Staal* v. *Grand Rapids & I. R. Co.,* 57 Mich 239, headnote 6), it would appear that whatever their actual loss may have been under the circumstances, these relatives have sustained no pecuniary legal damages as a result of James Heider's death (*MacDonald* v. *Quimby, supra*)."

vide such special remedy, there being no other remedy, is attested by *Stout* v. *Keyes,* 2 Doug (Mich) 184 (43 Am Dec 465), and *Creek* v. *Laski,* 248 Mich 425 (65 ALR 1113). See how *Stout* v. *Keyes* was employed to such specific end in *Waynick* v. *Chicago's Last Department Store* (CCA 7), 269 F2d 322 (77 ALR2d 1260), certiorari denied 362 US 903 (80 S Ct 611, 4 L ed 2d 554). See, also, 1 Am Jur 2d, Actions, § 47, p 579, "Existence of remedy for a wrong."

5. A closely divided decision to amend these 1939 enactments, by judicial action as voted here, cannot stand for long. Our probate and circuit courts, and our Court of Appeals, will immediately run into unsolvable problems of distribution of damages adjudged for loss of support, loss of services, loss of companionship and loss of consortium. Genuine dependents and genuine nondependents will compete for greater shares of a whole which, usually, is limited in amount by jury verdict, insured limits, or judicially approved settlement. Such limitations, known as they are, are bound to leave too little for all members of the now judicially expanded class of beneficiaries. It is inevitable that this Court of final resort will be compelled, ultimately, either to backtrack or amend the 1939 enactments the more. To partake of Macbeth, who in juristic Michigan can look into the seeds of time and say which grain will grow, and which will not, here in our claustral quarters?

-    -    -    -    -

The textual beginning of this opinion was taken from one of Justice Cardozo's lectures (judges "may not nullify or pervert a statute because convinced that an erroneous axiology is reflected in its terms."). The same jurist has provided an appropriate ending:

"Judges have, of course, the power, though not the right, to ignore the mandate of a statute, and render judgment in despite of it. They have the power, though not the right, to travel beyond the walls of the interstices, the bounds set to judicial innovation by precedent and custom. None the less, by that abuse of power, they violate the law." (Cardozo, Nature of the Judicial Process, p 129.)

I vote to reverse and remand for entry of judgment, in favor of plaintiff, limited to the statutory damages as proven and excluding unproven damage for pecuniary injury. The issue being of general public concern, no costs on appeal should be allowed.

Supplement (April 28, 1965).

Now that we know what our majority decision is to be (that of affirmance of a damage award, to non-dependent survivors of the deceased, for loss of companionship), it would seem that each of us owes the profession a statement of viewpoint concerning *judicial* addition, after the assessment of damages in a wrongful death case has been made, of interest upon that part of the damages found as having been sustained by the beneficiaries between date of death and date of verdict.

I perceive no reason for disturbing long settled practice. The allowance of interest is rightfully made, *by the jury,* upon due instruction that damages for pecuniary injury must be assessed and reported by a lump-sum verdict constituting the *present value*—that is at the time of verdict—of the damages found as having been suffered and to be suffered by such beneficiaries. The plaintiff personal representative, if found entitled to damages for pecuniary injury suffered by the beneficiaries, is entitled to have added, *by the jury,* legal interest calculated upon the amount of damages suffered by the beneficiaries between death and verdict (*Larsen*

*v. Home Telephone Company,* 164 Mich 295, 324, 328). Correspondingly the lump sum amount the jury must ascertain and report is subject to instructed reduction of the included amount which represents future damages, which reduction is accomplished by the customarily instructed formula of division.

The jury, not the judge, is the constitutional assessor of the *amount* of the total damages that are recoverable for "pecuniary injury." The jury, not the judge, is the appointed determiner of the present-worth amount thereof, as of rendition of verdict. To conceal from the jury the fact that the trial judge may or will add more, to the lump-sum the jury is to report, is to suggest that due present-worth instruction need not be made, or that the jury might fail to follow such instruction. Let jury instructions regarding death damages be right, and there will be no occasion, plausible or otherwise, for *judicial* addition to or subtraction from the amount of the jury's verdict (save of course when GCR 1963, 527.6 is properly applicable, which is not the case here).

I am aware, in recording the above, that this case of Currie was tried to the court. But the same rules of damages and assessment thereof should be made to apply whether the issue is tried to the court or to a jury. I am constrained on that account to append the above lest our trial judges be led to wonder again what this Court has held, or, really, what it wants.

KELLY, J. (*dissenting*). For the reasons stated in my opinion in *Reisig* v. *Klusendorf,* 375 Mich 519, I disagree with the result reached in Justice ADAMS' opinion in the instant case.

DETHMERS, J., concurred with KELLY, J.